# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| STACEY ERNST, et al., | ) |
| Plaintiffs, | ) |
| | ) Case No: 08 C 4370 |
| v. | ) Judge Norgle |
| | ) Magistrate Judge Jeffrey Cole |
| CITY OF CHICAGO, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiffs are five women who applied for paramedic positions with the Chicago Fire Department ("CFD") beginning in 2004. All five met the requirements for hire and were placed on the hiring eligibility list. Each took the CFD's physical ability test (PAT) and were informed they did not pass and, as a result, were removed from the hiring eligibility list. Each filed charges with the Equal Employment Opportunity Commission and Illinois Department of Human Rights and, subsequently, joined in this lawsuit against the City on August 1, 2008. Plaintiffs' complaint alleges that the PAT adversely impacts female applicants, is not job-related for the paramedic position, and violates Title VII of the Civil Rights Act of 1964 ("Title VII"); 42 U.S.C. §§ 2000(e) *et seq.*[1]

The City has moved to exclude the expert testimony of both of the plaintiffs' experts in this case, Dr. William McArdle and Dr. Michael Campion. Although this is the City's first attack on Dr. McArdle or Dr. Campion, the reports at issue here have been

---

[1] For the reasons explained in *Ernst v. City of Chicago*, 2012 WL 27594 (N.D.Ill. 2012), the case did not proceed as a class action.

discussed and considered on more than one occasion, including during a lengthy oral argument on the defendant's motions on February 28, 2014. [Dkt. #402]; *see also Ernst v. City of Chicago*, 2013 WL 4804837 (N.D.Ill. 2013). This time around, the City seeks to bar both expert witnesses from testifying under Fed.R.Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993); and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999).[2]

>Rule 702 governs the admissibility of expert testimony:
>
>A witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under the Rule, the trial judge acts as a "gatekeeper" to ensure that any and all expert testimony or evidence admitted "is not only relevant, but reliable." *Daubert,* 509 U.S. at 589. The insistence on reliability helps to ensure the integrity of the judicial process, *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir.1989), and is of such transcendent importance that judges can act *sua sponte* to prohibit testimony that does not pass muster under *Daubert*. *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1094 (7th Cir.1994).

While *Daubert* dealt with scientific testimony, its principles apply equally to non-scientific fields. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–49 (1999). And

---

[2] Although *Daubert* interpreted an earlier version of Rule 702, it remains the gold standard for evaluating the reliability of expert testimony and is essentially codified in the current version of Rule 702. *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013); *Lees v. Carthage College,* 714 F.3d 516, 521 (7th Cir.2013).

so, whatever the nature of the witness's expertise, Rule 702 "establishes a standard of evidentiary reliability," "requires a valid... connection to the pertinent inquiry as a precondition to admissibility," and mandates that the testimony have "a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert,* 509 U.S. at 590, 592).

Trial court judges have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.,* 526 U.S. at 152; *American Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 816 (7th Cir. 2010)("We give the court great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable . . . ."). But it is primarily a question of the reliability of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir.2000); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013).

As *Daubert* stressed: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596. And so, a trial court that unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed usurps the role of the

jury. *Stollings v. Ryobi Technologies, Inc.,* 725 F.3d 753, 766 (7th Cir.2013); *Smith,* 215 F.3d at 720.

Unfortunately, it's not always an easy line to draw, for "conclusions and methodology are not entirely distinct from one another." *Manpower*, *Inc*. 732 F.3d at 806-07; *General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997). For example, the Seventh Circuit was not always convinced, as it has been for some time now given holdings from *Smith* through *Manpower, Inc.*, that the soundness of the factual underpinnings of an expert's opinion were matters for the trier of fact. Earlier on in its *Daubert* jurisprudence, the court felt the matter was fair game for a *Daubert* motion. *See, e.g., Goodwin v. MTD Products, Inc*., 232 F.3d 600, 608 (7th Cir. 2000)(". . . the trial judge must determine whether [an expert's] . . . testimony had sufficient 'factual underpinnings, . . . .'"); *Bourelle v. Crown Equipment Corp.*, 220 F.3d 532, 536 (7th Cir.2000)(same). This serves to highlight the difficulty of applying *Daubert* and Fed.R.Evid. 702 in the real world.

But, such is the so-called "gatekeeper" role. Like many parties challenging the admissibility of expert testimony, the City seems to be looking for more than a mere "gatekeeper." As the Second Circuit has explained, trial judges acting as gatekeepers do not assume "the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul" that would "inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury." *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1045 (2nd Cir. 1995).

**Dr. McArdle**

Regarding the City's physical abilities test ("PAT"), the plaintiffs intend to have Dr. McArdle testify that: (1) the City failed to provide proper notification to candidates of specific test items and scoring requirements, including the failure to provide notification to candidates of test requirements within a time frame necessary to adequately train for the exam; (2) the City (and its contractor) misclassified the physiologic and metabolic demands of the test items; (3) the City (and its contractor) failed to provide adequate information to candidates as to the proper and most effective way to prepare for the PAT; and (4) the City failed to provide opportunities for candidates to view and practice the actual PAT within a sufficient time frame so as to optimize pre-test exercise training. Dr. McArdle contends that these failures had an especially pronounced effect on female applicants as, due to inherent sex specific biologic differences, women have a more difficult challenge achieving the same performance score on tests of physical fitness as male counterparts of equivalent training status. He further asserts that the differences in scores between men and women on physical fitness tests do not equate to women having lesser competence or capacity as paramedics. To the contrary, Dr. McArdle determined that the PAT, which disproportionately eliminated female candidates for CFD Paramedic positions, failed both in describing and evaluating the full spectrum of paramedic responsibilities and identifying candidates most likely to become competent paramedics. (Dkt. #308, at 5).

The City argues that Dr. McArdle did not employ reliable methods to reach his conclusions, and that certain of his conclusions were based on nothing more than his *ipse*

*dixit*. As for methodology, the City's contention is based on the premise that Dr. McArdle deviated from methodology he often employed in the past.

The City also briefly submits that Mr. McArdle, as an exercise physiologist, is not qualified to offer opinions on the PAT. But this is a poorly developed argument and the City tends to confuse the issue of Dr. McArdle's qualifications with the methodology he employed in this case. Dr. McArdle is certainly qualified to offer opinions on the efficacy of a physical abilities test in terms of paramedic job requirements. He is an exercise physiologist with over 45 years of experience in the field. He earned his Ph.D. in the subject from the University of Michigan in 1965 and has been a professor of nutrition and exercise science at New York's Queens College since then. He has also served as an adjunct professor at Columbia University, Adelphi University, and the Medical College of New York. He has written dozens of articles in peer-reviewed journals. He has authored or co-authored eight books, including three widely used textbooks. His research work on proper design and implementation of research protocols for studying exercise physiology has been funded by the National Institute of Health, the Office of Naval Research, and the U.S. Army Medical Research and Developmental Command. The City's own expert looked to one of his textbooks as authoritative. (Dkt. #308, Ex. 1, at 89-90). Another of the City's experts acknowledged that exercise physiology is the salient discipline for determining the nature of a physical strength involved in various exercises, testing components, and training programs for physical tests. (Dkt. #308, Ex. 2, at 26-27, 117-118; Ex. 2, at 96).

The City's main critique of Dr. McArdle is that he did not study the paramedic job and so has no basis for saying the PAT was an invalid test of whether one could meet

6

the demands of that job. But Dr. McArdle read all the City's expert's reports – save for that of his cohort, Dr. Campion – and read not only their deposition transcripts, but those of the plaintiffs as well. (Dkt. # 276, at 8; Dkt. #402, at 42-44, 54-55). As the City has to concede, its expert's report included a detailed job analysis. Thus, Dr. McArdle was able to garner rather detailed information regarding the requirements of the paramedic job with the Chicago Fire Department, (Dkt. #402, at 43), and it is inconsequential for *Daubert* purposes that, prior to this case, Dr. McArdle may not have conducted a study of a paramedic's job in general. Unlike the expert in *Obrycka v. City of Chicago*, 792 F.Supp.2d 1013, 1024 (N.D.Ill. 2011), Dr. McArdle based his findings on case-specific materials.

The City also takes Dr. McArdle to task for not using the same methodology in this case that he used some 30 years ago when he analyzed tests for other city's police and fire departments. In those instances, he did ride-alongs with police and fire fighters. In this case, he did not. But it is not clear why that invalidates Dr. McArdle's opinion here. It cannot be that an expert, exercising one method early in his career, is forever estopped from employing any other method. There is nothing to suggest that the ride-along is what the City calls "the cannonical method" in this type of case or that Dr. McArdle's method was somehow inherently flawed. *Cf. Braun v. Lorillard Inc.*, 84 F.3d 230, 234 (7th Cir. 1996)(evidence established the standard method of testing and that the alternative method employed was likely to produce a false negative result). Interestingly, the City's own experts did not follow the so-called "cannonical" method of going on ride-alongs. (Dkt. #308, at 16).[3]

---

[3] Had he used a method he employed decades ago, the City would no doubt have faulted him for
(continued...)

7

The thoroughness of Dr. McArdle's study of the paramedic job – reading about it versus observing it – goes to the weight of his testimony rather than its admissibility. *Manpower*, 732 F.3d at 807. This is prime territory for "vigorous cross-examination," which, along with "presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. *See also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321 (2009)(". . . methodology . . . [is] commonly the focus in the cross-examination of experts."); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013)("It is up to the trier of fact, however, to evaluate the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis.").

Finally, the City also calls into question several snippets from Dr. McArdle's report for being based on nothing more than his *ipse dixit,* which is never sufficient. *Manpower, Inc.*, 732 F.3d at 806; *Wendler & Ezra, P.C. v. American Intern. Group, Inc.*, 521 F.3d 790, 791-792 (7th Cir.2008); *Echo, Inc. v. Timberland Machines & Irr., Inc.*, 661 F.3d 959, 965 (7th Cir.2011).[4] These include his observations on certain differences between men and women participating in physical capacity evaluations. In these instances, Dr. McArdle indicated that he was basing his statements on his decades of experience in the field of exercise physiology. For example, in the past, he conducted similar physical capacities tests in his classes. In those tests, he observed that "the

---

[3](...continued)
using a time-worn methodology and sought to exclude his opinion on that basis.

[4] Courts are never allowed to take only on faith whatever a paid expert claims, *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir.1997), no matter how distinguished his credentials. *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir.1996).

women had much more difficulty reaching their plateau than the men." Rather quickly, the men would reach a point of exertion such that they would "scream as they pulled. And the women . . . took . . . a long time to disinhibit themselves to give a true maximal effort." (McArdle Dep., 4/23/13, at 133-34). He also has studied males and females participating in various sports over the years. And the greater exposure men have to "disinhibitory types of physical activities." (McArdle Dep., 4/23/13, at 135).

So, Dr. McArdle did not simply offer his *ipse dixit*; rather, he linked his assertion to what he has seen and experienced in his work in the field over the years. And that is perfectly permissible *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761-62 (7th Cir. 2010)(opinions based on what expert had seen and experienced during his time in the field were admissible). And, again, Dr. McArdle studied the job requirements and the test at issue. He did not simply eschew reliance on proper methodology and author an unsupported expert opinion. *Cf. Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999). And he went beyond simply basing his opinions on "experience" without further explanation. *Cf. Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 896 (7th Cir. 2011)(in some instances, even an expert's unadorned "conclusion, without more, may be supportable based on [the expert's] 'extensive and specialized experience.'"). At bottom, the City's gripe with McArdle's opinion seems to be that women have changed insofar as the physical activities they participate in and how they participate since Dr. McArdle formed such opinions. (Dkt. #276, at 11). But, that is the City's opinion and in any event that goes to weight and credibility – not admissibility. *Stollings*, 725 F.3d at 765; *Lees v. Carthage College*, 714 F.3d 516, 526 (7th Cir. 2013).

**Dr. Campion**

The plaintiffs retained Dr. Campion to conduct an adverse impact analysis of the PAT, and to offer a critique of the test's validation, design, and implementation. Dr. Campion found that the PAT "had a significant adverse impact against women applicants" overall, each time it was administered, in each of its component parts, and as a whole; the validation study, according to Dr. Campion, "does not demonstrate the validity of the... [PAT] used... to hire paramedics or adequately consider alternatives." (Campion Rebuttal Report, at 4). He further concluded that the job analysis over-emphasized physical tasks and based requirements on the most demanding task, thereby increasing adverse impact.

It did not, he concluded, measure whether the abilities were necessary at hire or could be learned after hire, did not consider other abilities that would have lessened adverse impact, and did not accurately reflect the realities of the job as the analysis was done 13 years ago. He felt the test was developed with little consideration of its adverse impact, including the components that would result in large gender differences – such as tests of maximum performance – with mathematical certainty. (Campion Rebuttal Report, at 24-25). The test was validated in a manner that was weak for the selection procedures used, that merely correlated one physical test with another and not the actual job, and that encouraged gender stereotypes to operate. (Campion Rebuttal Report, at 6-11; 3-12; Campion Dep., 4/30/2013, at 22). Dr. Campion also concluded that the passing score was set too high. (Campion Rebuttal Report, at 9). He proposed several less discriminatory alternatives to the City's PAT (Campion Rebuttal Report, at 12-13),

10

and responded to each of the City's and its experts' rebuttals. (Campion Rebuttal Report, at 12-51).

The City can't decide how it feels about Dr. Campion's qualifications to testify on these matters. It argues in its brief that he is not qualified because he never studied the paramedic job. (Dkt. # 274-1, at 8). Then, at oral argument, the City stated that it had no issue with Dr. Campion's qualifications; it had no Fed.R.Evid. 702(a) objection. (Dkt. # 402, at 59). But a brief time later, the City contradicted itself and suddenly contended he was not qualified. (Dkt. # 402, at 66). So it is hard to say whether the City is challenging his qualifications or not. The result is the same, however.

Dr. Campion holds a Ph.D. in Industrial and Organizational Psychology, and has been a professor of management at Purdue University since 1986. He has published over 100 peer-reviewed articles and given over 200 peer-reviewed presentations. A number of these publications certainly would seem to apply to the issues he speaks to in this case: Morgeson, F.P., Campion, M.A., & Bruning, P.F., *Job & Team Design*, in G. Salvendy, *Handbook of Human Factors and Ergonomics* (4th ed.)(in press); Morgeson, F.P. & Campion, M.A., *Social and Cognitive Sources of Inaccuracy in Job Analysis*, 82 J. of Applied Psychology 627 (1997); Campion, M.A., *Ability Requirement Implications of Job Design: An Interdisciplinary Perspective*, 42 Personnel Psychology 1 (1989); Campion, M.A., *Interdisciplinary Approaches to Job Design: A Constructive Replications with Extensions*, 73 J. of Applied Psychology 467 (1988); Campion, M.A. & Thayer, P.W., *Development and Field Evaluation of an Interdisciplinary Measure of Job Design*, 70 J. of Applied Psychology 29 (1985); Campion, M.A., *Personnel Selection for Physically Demanding Jobs: Review and Recommendations*, 36 Personnel Psychology

11

527 (1983); Campion, M.A. & Phelan, E.J., *Biomechanics and the Design of Industrial Jobs*, 60 Personnel J. 949 (1981).

Dr. Campion's areas of expertise include job analysis, work design, and testing and assessment. He has spent his career researching candidate selection for physically demanding jobs and designing jobs to reduce physical ability demands. He has been the editor of the Personnel Psychology journal and president of the Society for Industrial and Organizational Psychology. *See generally* http://www.siop.org/Presidents/campion.aspx. If this does not qualify him to speak on the topics at hand, it is unclear what more the City supposes one would need or what field would be more apropos. The City's own expert on these issues, Dr. Jacobs, is an industrial/organizational psychologist. The question of adverse impacts of employment testing and alternative testing are certainly in the wheelhouse of the industrial/organizational psychologist. *See, e.g.,* Brief of Industrial-Organizational Psychologists as Amici Curiae in Support of Respondents, *Ricci v. DeStefano*, 557 U.S. 557 (2009), 2009 WL 796281; Amy L. Wax, Disparate Impact Realisim, 53 Wm. & Mary L. Rev. 621 (2011).

Consequently, this case is nothing like *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2011) – relied upon by the City – where the expert, a physician whose expertise was in oncology, admitted she knew nothing about the use of orthopedic nails to treat fractures. *Id.* at 969. That doctor had never studied the matter and had never been published on *any* matter. Accordingly, the court ruled the testimony inadmissible. Unlike the expert there, however, Dr. Campion is clearly operating "within the reasonable confines of his subject area . . . ." *Id.* at 970.

As with Dr. McArdle, the City's gripe with Dr. Campion's qualifications seems more an attack on his methodology. The City complains that Dr. Campion's general experience does not allow him to opine about a specific job in a specific city. Echoing its critique of Dr. McArdle, the City complains that Dr. Campion did not perform a hands-on analysis of the CFD paramedic job. But, as the City eventually has to concede, Dr. Campion did gather information about the job through reading (Dkt. # 402, at 73-74) – a fact stubbornly ignored by the City even as late as oral argument.

In addition, in regard to alternative testing, Dr. Campion did some internet research into how other cities vet their applicants. Of course, it seems that internet research is all the rage, even in the most serious and august quarters, where one would expect rigorous methodology was *de rigeur*. *See Conrad v. AM Community Credit Union*, 2014 WL 1408635, 2 (7th Cir. 2014); *Krien v. Harsco Corp.*, 745 F.3d 313, 316 (7th Cir. 2014); *Wourms v. Fields*, 742 F.3d 756, 758 (7th Cir. 2014); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Mead Johnson & Co. LLC*, 735 F.3d 539, 542 (7th Cir. 2013). *See also* Richard Posner, *Remarks on Appellate Advocacy*, 9 The Circuit Rider, 17, 18 (Nov. 2009).

For example, Dr. McArdle looked into what the town of Gulf Breeze, Florida, does. The City complains that such a little town would seem to have nothing to do with a city the size of Chicago (Dkt. # 78) and, intuitively, that would seem a fair criticism. But that's a question of the quality of data Dr. Campion used and the factual underpinnings of his conclusions. These are matters for cross examination and the trier of fact. *Goodpaster*, 736 F.3d at 1068; *Manpower, Inc.*, 732 F.3d at 806. Moreover, Dr. Campion didn't stop at Gulf Breeze – he also looked into what Philadelphia and St. Louis

did. (Dkt. # 79). And so, unlike the expert in *Obrycka*, 792 F.Supp.2d at 1024, Dr. Campion based his findings on case-specific materials. Moreover, the striking of the expert in *Obrycka* was all but necessitated by the fact that the expert *disavowed his own method*. *Id.* at 1028 & n.13.

Beyond that, Dr. Campion had his wealth of experience in the field to draw upon. Fed.R.Evid. 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience. *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 412 (7th Cir. 2006); *Walker v. Soo Line R.R.*, 208 F.3d 581, 591 (7th Cir. 2000). Indeed, even the Supreme Court has acknowledged that "no one denies that an expert might draw a conclusion from a set of observations based on extensive specialized experience." *Kumho Tire,* 526 U.S. at 156.

As it did with Dr. McArdle, the City also takes Dr. Campion to task for failing to adhere to certain methodologies he had employed in the past. *See, e.g., E.E.O.C. v. Dial Corp.*, 469 F.3d 735 (8th Cir. 2006)(observed the job and spoke with workers). But, as with Dr. McArdle, there is nothing to suggest that those methods were "cannonical" and that no other methods may be reliably employed. *Cf. Braun*, 84 F.3d at 234 (evidence established the standard method of testing and that the alternative method employed was likely to produce a false negative result). "[E]xperts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000). The City is free to alert the jury to Dr. Campion's change in methodology and attempt to undermine the method he used this time on cross-examination. *Melendez-*

*Diaz*, 557 U.S. at 321; *Tussey v. ABB, Inc.*, – F.3d –, –, 2014 WL 1044831, 7 (8th Cir. 2014); *Howard v. Walker*, 406 F.3d 114, 127 (2nd Cir. 2005).

The City contends that Dr. Campion did not conduct any statistical analysis of the PAT or independently assess the data the validation study relied upon. On the contrary, Dr. Campion's two reports evince a rather thorough analysis of the data the City provided. (Dkt. # 274-2, at 13-20; # 274-4, at 13-15, 39-41). It is not clear what more the City thinks is required here. To the extent the City finds flaws in the factual underpinnings of Dr. Campion's opinions – for example, whether Dr. Campion had to review the cost figures for various alternate testing methods – that is a matter for the trier of fact. *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013)("It is up to the trier of fact, however, to evaluate the "soundness of the factual underpinnings of the expert's analysis . . . ."); *Manpower, Inc.*, 732 F.3d 796, 806 (7th Cir. 2013).

The City also takes issue with some of Dr. Campion's phrasing. At some points in his report, he uses qualifiers like "might," "it's possible," "appear to be," "potentially," "would likely," or "could." It's not entirely clear, but the City seems to suggest that this is rank speculation that cannot be admitted as expert testimony. It's true that the courtroom is no place for guesswork, even for inspired scientific guesswork. *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 645 (7th Cir. 2010). But when read in context, Dr. Campion's opinions do not appear to be true speculation. This is not a case where the expert had no information or data on which to base his opinion, rendering it mere speculation. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 896 (7th Cir. 2011); *Trustees of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Sav. Plan Trust Funds v. Royal Intern. Drywall and Decorating, Inc.*, 493 F.3d

782, 788 (7th Cir. 2007)(distinguishing between opinions based on subjective belief and those rooted in specialized knowledge); *see also Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 432 (7th Cir. 2013)(allowing that careful scientists might not express their opinions unreservedly); *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010)(expert need not testify with complete certainty).

Should they turn out to be, however – or if some of Dr. Campion's conclusions are weaker than others – those conclusions can be scuttled through skillful cross-examination. *Manpower, Inc.*, 732 F.3d at 809 (expert's reliance on faulty information was a matter for cross-examination); *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 432 (7th Cir. 2013)("Our system relies on cross-examination to alert the jury to the difference between good data and speculation.").

## CONCLUSION

In essence, the City is asking the court to supplant the adversarial process and to substitute itself for the jury. This, a court cannot do. *Manpower, Inc.*, 732 F.3d at 810 (overturing district courts barring of expert testimony where the court's rulings were "roadmap for . . . cross-examination"). The defendant's motions to bar the testimony of the plaintiffs' expert witnesses [#273, 275] is DENIED.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 5/5/14