IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STACY ERNST, et al.<br><br>    Plaintiffs,<br>v.<br><br>CITY OF CHICAGO,<br><br>    Defendant. | No. 08 c 4370<br><br>Judge Charles R. Norgle, Sr.<br><br>Magistrate Judge Jeffrey Cole |

**Opposition to City of Chicago's Motion for Judgment as a Matter of Law**

I.   Introduction

Despite this Court's prior rejection of the City's motion for partial summary judgment, the City again attempts to prevent the jury from deciding Plaintiffs' disparate treatment claim. The City's current motion follows Plaintiffs' presentation of more extensive evidence to the jury than that cited by this Court when it denied the City's summary judgment motion.

On February 25, 2014, this Court denied the City's motion for partial summary judgment on Plaintiffs' disparate treatment claim because the Plaintiffs had at that time put forth sufficient evidence. Specifically, this Court cited to evidence that the Plaintiffs were Illinois-certified paramedics and otherwise met the City's hiring requirements for paramedics prior to being subjected to the PPT, the PPT was not job-related, the City knew that the PPT had an adverse impact on women, the City knew that adverse impact was an element of a discrimination claim, the City had less discriminatory alternatives that would have passed equally qualified candidates, and yet the City took no action. Order at 1-2, Feb. 25, 2014, ECF No. 382. In addition, this Court relied upon *United States v. City of N.Y.*, 717 F.3d 72, 91 (2d Cir. 2013):

> At trial on the ultimate issue of whether there was a policy of discriminatory intent, the fact-finder will consider, among other things whether . . . the lack of job-relatedness of the Exams should have been apparent to the City and whether

1

the City's use of the Exams, once their sexually disparate impact was known, proves, in light of the history of low female hiring, that the City used the Exams with the intent to discriminate (internal quotations omitted).

Order at 2, Feb. 25, 2014, ECF No. 382.

Here, the evidence presented to the jury includes not only every fact cited in the summary judgment decision but also additional evidence relevant to the disparate treatment claim. The City's Deputy Chief of Staff stated that she was concerned about the adverse impact on women. Def. trial. ex. 12. Moreover, the Physical Performance Test ("PPT") was not job-related, the City was repeatedly warned that it created a test with an adverse impact on women, and the City time-after-time and test after test purposefully avoided even attempting any of the numerous available less discriminatory alternatives.

## II. The Analysis From this Court's Summary Judgment Decision Denying the City's Motion for Partial Summary Judgment on Plaintiffs' Disparate Treatment Claim Should Apply to the City's Motion for Judgment as a Matter of Law

The Court should apply the analysis from its summary judgment decision to the City's pending motion for judgment as a matter of law because the standard for a motion for judgment as a matter of law "mirrors the standard" for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (citation omitted). "The primary difference between [the summary judgment and judgment as a matter of law motions] is procedural . . ." *Id.* As in a summary judgment motion, the Court "must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence." *Parks v. City of Chicago*, 2012 WL 4049359, at *1 (N.D. Ill. Sept. 13, 2012) (citation omitted). Likewise, the court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004) (citation omitted).

An employee who alleges discrimination under Title VII:

> need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522-23 (2013). In addition, disparate treatment can be established from an employer's knowledge that its selection test has an adverse impact on women, the employer's continued use of the test, and the refusal to accept any less adverse alternatives or other procedures that would mitigate the adverse impact on women. *See Washington v. Davis,* 426 U.S. 229, 241-243 (1976) (an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including facts that a practice bears more heavily on minorities); *EEOC v. Inland Marine Industries,* 729 F.2d 1229 (9th Cir. 1984); *Dixon v. Margolis,* 765 F.Supp. 454 (N.D. III. 1991).

In *Dixon,* 765 F. Supp. 454, Illinois State Police Officers alleged that the State intentionally discriminated against black officers with regards to promotions. The State moved for summary judgment on the claim of intentional discrimination. The Plaintiffs argued there was intentional discrimination because there was an adverse impact on black officers, the State received reports that indicated there was an adverse impact, and yet the state continued to use the promotion test. *Id.* at 60. The Court denied the motion for summary judgment because a "trier of fact could infer from this evidence and the adverse impact evidence that defendants continued to use the tests as a means of intentionally discriminating against blacks. That is not a necessary inference to draw, but it is a possible and reasonable one and therefore is a sufficient basis for finding there to be a disputed factual issue as to defendants' discriminatory intent." *Id*.

In *EEOC v. Inland Marine Industries,* 729 F.2d 1229 (9th Cir. 1984), the Court of Appeals upheld an intentional discrimination finding on behalf of plaintiffs who alleged

disparate treatment on the basis of race. The Court stated that the defendant never attempted to address the adverse impact despite its knowledge of adverse impact. As a result, the Court held:

> By refusing to change its subjective wage-setting policies or to bring black wages in line with those of whites, [the employer] ratified the existing disparities. [The employer's] *ratification constituted all the intent the court needed to find Inland Marine guilty on a disparate treatment theory.*

*Id.* 729 F.2d at 1235 (citations omitted) (emphasis added); *see also United States v. Bd. of Sch. Comm'rs of City of Indianapolis, Ind.*, 637 F.2d 1101, 1105 (7th Cir. 1980) ("normally the actor is presumed to have intended the natural consequences of his deeds").

In another Title VII action against the City, the City acknowledged – around the same time the City was developing the PPT – that once it received test scores that showed an adverse impact, the City "was required to consider any equally valid, less discriminatory selection method that was available to ameliorate the disparate impact." *Brown v. City of Chicago*, 8 F. Supp. 2d 1095, 1111 (N.D. Ill. 1998) (citing 29 C.F.R. § 1607.3(B)). Moreover, less than one year prior to the 2004 PPT, in an appeal where the City was the defendant, the Seventh Circuit stated that the "Uniform Guidelines on Employee Selection Procedures require reasonable review of valid selection methods which have a disparate impact." *Allen v. City of Chicago*, 351 F.3d 306, 315 (7th Cir. 2003).

**III.** **At Trial, the Plaintiffs Have Introduced Substantially More Evidence than this Court Relied Upon in its Decision Denying the City's Motion for Partial Summary Judgment**

    **A.** <u>**The Plaintiffs Introduced Evidence that the Physical Abilities Test had an Adverse Impact on Women and that the City Knew the PPT had an Adverse Impact**</u>

Dr. Michael Campion, Plaintiffs' industrial organizational expert, testified that the CFD's 2004 PPT had an adverse impact on women. Tr. 628:18-21, Nov. 10, 2014. Specifically, *Id.* at

628:6. While women had a substantial failure rate, almost no men failed the PPT and women had a failure rate that was twenty times higher than for men. *Id*. at 625:6-10.

At the time of the 2004 PPT, the City had been well aware for at least five years that its PPT had an adverse impact on women. In 1998, Adrianne Bryant, a managing deputy at the City's Department of Personnel, was "<u>very</u> concerned about female adverse impact" from the PPT. Pls. trial ex. 54. At the same meeting, taking all reasonable inferences in favor of the nonmoving party, Dr. Gebhardt stated that there is adverse impact from the paramedic PPT but it will not be as significant as the adverse impact from the firefighter physical abilities test. *Id*.

Moreover, the 2000 and 2001 CFD paramedic PPTs had a clear adverse impact on women. In an April 2000 letter to Sheldon Hurbovitz, who was the supervisor of personal administration for the CFD and then the assistant director of personnel for the CFD, Dr. Gebhardt stated that the 2000 PPT's passage rate for men was 99.4% and for women it was 63.8%. Pls. trial ex. 6; Tr. 580:8-22 and 589:3-6, Nov. 10, 2014.[1] In 2001, the City was notified that the passage rates for the PPT were 97.77% for men and 58.97% for women. Pls. trial ex. 7. Dr. Gebhardt also sent Pat Howe, who worked at the CFD's Bureau of Administrative Services, the 2000 and 2001 PPT passing rates for men and women. Pls. trial ex. 18a and 18b. Chief Stewart testified that he too was aware that more women than men failed the PPT. Tr. 529:1-5, Nov. 6, 2014.

---

[1] The City contract with HPS required reporting of the pass/fail of applicants. Def. trial ex. 15, ERN 429.

B. **There Is Substantial Evidence that the City Failed to Explore Numerous Available Less Adverse Alternatives even though It Had Knowledge of the PPT's Adverse Impact on Women**

Throughout the five years the City knew it had developed a PPT with an adverse impact, the City also knew it was required to search for less discriminatory alternatives pursuant to the Uniform Guidelines. Dr. Gebhardt's report on the development and validation of the paramedic PPT demonstrates that the developers and the City knew the Uniform Guidelines applied to the development and application of the PPT. Def. trial ex. 11. Under the Uniform Guidelines on Employee Selection Procedures, the City was required to use any other available selection procedure that reduced the adverse impact. 29 C.F.R. § 1607.3(B).

Dr. Campion testified extensively that the City had numerous alternatives that would have reduced the adverse impact on women and chosen equally qualified paramedics. Tr. 670:12-20, 671:19-674:25, Nov. 10, 2014. First, the PPT was unnecessary because CFD paramedics were performing well prior to the PPT. *Id*. In addition, all the applicants were already paramedics. *Id*. Second, sufficient training on the PPT would have reduced the adverse impact. *Id*. Other municipalities utilize training to reduce adverse impact. *Id*.

Likewise, Dr. McArdle, Plaintiffs' exercise physiologist expert, testified that if the applicants were given a sufficient amount of time to train it would have reduced the adverse impact. Tr. 208:5-8, Nov. 6, 2014. Yet the City did not send out notice of the PPT until a little over one month before the 2004 PPT test. Pls. trial ex. 3A, ERN000284, 000293-4; Tr. 208:17, Nov. 5, 2014. Moreover, Dr. Gebhardt provided the City with several options related to training that would decrease the PPT's known adverse impact on women. Def. trial ex. 11. Dr. Gebhardt told the city that:

> the use of a videotape of the test battery and a brochure are beneficial for reducing adverse impact and preparing candidates for the test and procedure. Such materials can help eliminate poor scores due to unfamiliarity with the test . . . A

> method to reduce adverse impact is to develop and implement a candidate physical fitness program. Such a program will allow candidates an opportunity to develop the physical abilities needed for acceptable job performance before being tested for selection. It should be noted that these tests will have an impact on women.

*Id.* The evidence shows the City did not even request information on the costs of such a program and rejected the use of a pretest videotape for paramedic applicants. (Pl. Ex. 51, Gebhardt to Stensland).[2]

The third potential alternative, according to Dr. Campion, was to have the applicants practice on the PPT's equipment. Tr. 673:19-674:25, Nov. 10, 2014. Dr. McArdle also described how there would have been less adverse impact had the City communicated sufficient knowledge of the specific components of the PPT to the applicants. Tr. 463:13-466:2, Nov. 6, 2014. Yet the City did not allow the applicants to practice on the PPT equipment prior to taking the PPT. Tr. 217:20-3 and 328:10-12, Nov. 5, 2014. In addition, the City described neither the specific components of the PPT nor how the PPT was scored. Pls. trial Ex. 4; Tr. 210:19-23, Nov. 5, 2014.

Dr. Campion described a fourth potential alternative to reduce adverse impact on women, which was to test for important paramedic qualities that are not captured by the PPT. Tr. 671:19-674:25, Nov. 10, 2014. Examples of such skills are interpersonal skills, teamwork, prior work experience, and skills related to medical procedures. *Id.* Fifth, many organizations similar to the CFD are using equipment that is making the physical tasks easier. *Id.* Indeed, in 2004, the CFD began purchasing stretchers that provided greater assistance to its paramedics. Pls. trial ex. 15.

---

[2] There is moreover no reason to believe neither that such program would be costly nor that the City would be required to bear the cost burden of such program. In 2004, the City charged applicants $25.00 to apply to cover costs. It could easily have provided a candidate fitness program at the applicants own costs with waivers for those in disadvantaged circumstances.

The City knew of these stretchers by April 1, 2013 at the latest because that is when the City's Chief Procurement Officer signed for purchase of these stretchers. *Id*.

Despite the adverse impact and the availability of less discriminatory alternatives, the City made no effort to look for less discriminatory alternatives. Dr. Campion testified that there were many other vendors who could have developed a physical abilities test for CFD paramedic hiring. Tr. 676:8-23, Nov. 10, 2014. However, the City went out of its way to award a no-bid contract to Dr. Gebhardt. Def. trial ex. 12; Tr. Nov. 6, 2014 am at 562:11-14. Ms. Bryant, then the Deputy Chief of Staff, wrote a memorandum stating, "I am requesting the Purchasing Agent authorize a sole source contract between the City of Chicago and [Dr. Gebhardt's company]." Def. trial ex. 12. Ms. Bryant then provides justification for this no-bid contract, including that Dr. Gebhardt's company has a "good working relationship with the CFD's top brass [, which] serves as strong incentive to continue our relationship with [Dr. Gebhardt's company]." *Id*. In addition, Ms. Bryant testified that she did not undertake any searches or reviews of other potential physical ability tests from other municipalities before signing the no-bid contract. Tr. 551:13-552:9, Nov. 6, 2014. Thus, the City actively took steps that precluded any search for an alternative selection procedure with less discriminatory impact.

Following this no-bid contract, the CFD continued to choose to not use any of the known, available less discriminatory alternatives. Chief Stewart testified that he took no action to address the adverse impact on women. Tr. 529:17-21, Nov. 6, 2014. Chief Stewart also testified that he not only never read the PPT's validation study in detail but also never observed the PPT. *Id*. at 527:19-25. Mr. Hurovitz, who was responsible for testing at the CFD, testified that he neither sought less discriminatory alternatives nor inquired whether anyone else in the City was addressing the adverse impact. Tr. 580:8-22, 590:2-7, 599:5-10, Nov. 10, 2014.

### C. The Plaintiffs Entered Evidence that the PPT was Unnecessary and not Job-Related

According to the record established by the Plaintiffs, the City's actions demonstrate that it does not believe that physical fitness tests are necessary for its CFD paramedics. Charles Stewart III, the current first Deputy Fire Commissioner, testified that the CFD did not utilize a PPT as a requirement for entrance into its paramedic academy prior to 2000. Tr. 520:20-23, 523:25-524:3, Nov. 6, 2014. At the same time, the CFD required firefighter applicants to pass a physical abilities test. Tr. 581:15-582:4, Nov. 10, 2014. Moreover, from 1999 until the present, the City never required any of its active paramedics to take any physical fitness test. *Id.* at 528:16-9.

Chief Patrick Howe testified that the Fire Commissioner assigned him to work on the development of the PPT with Dr. Gebhardt. Tr. 894:4-6, Nov. 12, 2014. He was the department liaison with Dr. Gebhardt. *Id.* at 896:2-9. Chief Howe began at the CFD as a paramedic and his paramedic license was current as of at least 2010. *Id.* at 891:17 and 893:9-10. If the test was so important to choosing the best paramedic candidates, the City would not have inconsistently is administered the PAT and failed of the CFD to even follow the directions for use of the PPT. Tr. 223:9-229:9 and 332:15-333:18, Nov. 5, 2014; Tr. 455:8-456:3, Nov. 6, 2014.

The CFD received a job analysis from another provider in 1989 that stated it could address the adverse impact on women. Pl. trial ex. 14, ERN 2840-42. But the City did not accept that proposed physical abilities test. Therefore, the City rejected a test that attempted to address adverse impact on women and then later not only accepted a test that it knew had an adverse impact on women but also disregarded any means of mitigating the adverse impact on women.

Indeed, the PPT was not job-related. Dr. McArdle testified that the PPT was not related to the job of a paramedic, and that the PPT should not be used to choose paramedics for the CFD. Tr. 453:17-454:7, Nov. 6, 2014. Likewise, Dr. Michael Campion, Plaintiffs' industrial organizational psychologist, testified that no component of the PPT resembles the CFD paramedic position. Tr. 644:19-20 and 651:2-652:1, Nov. 10, 2014. Rather, Dr. McArdle explained that if the CFD wanted to do a physical fitness test for the paramedic job then it should just test paramedics' actual tasks, such as lifting someone on a stretcher. Tr. 453:17-454:7, Nov. 6, 2014. Another reason that the PPT was not job-related is that, as stated in the City's February 26, 1998 meeting notes, most of the paramedics' actual tasks involve two people. Pls. trial ex. 54. Moreover, John Leen, an Ambulance Commander for the CFD who has been a CFD paramedic since 1997, testified that he has not noticed any differences in the paramedics who were hired after 2000 (the first PPT) and those hired before 2000. Tr. 1190:18-1191:1, Nov, 13, 2014.

According to Dr. Campion, Dr. Campion further testified that the PPT could not be validated and was not predictive of CFD paramedic job performance. Tr. 632:4-10, Nov. 10, 2014. It was particularly unnecessary to utilize the PPT because of its significant adverse impact on women, the paramedic applicants were licensed as such by Illinois, and they had worked as paramedics. Tr. 636:14-24.

### D. The Plaintiffs Introduced Evidence that They were Illinois-Licensed Paramedics and Otherwise Met the City's Pre-Academy Requirements

The City's pre-academy requirements for paramedic applicants are that they have a current Illinois EMT/Paramedic license, a current Illinois driver's license, a current Health Care Provider CPR card, and residency in the City of Chicago. Pls. trial ex. 1. Each of the Plaintiffs – Stacy Ernst, Dawn Hoard, Katherine Kean, Michelle Lahalih, and Irene Res-Pullano – had a

current EMT/Paramedic license. Pls. trial ex. 2A, 2B, 2C, 2D, 2E. Each of the Plaintiffs had an Illinois driver's license. *Id*. Each of the Plaintiffs was a resident of the City of Chicago. *Id*. Each of the Plaintiffs had a current CPR card. *Id*. Accordingly, each of the Plaintiffs met the City's pre-academy requirements other than the PPT.

Katherine Kean has been an Illinois-licensed paramedic since 1999. Tr. 148:11-14, Nov. 5, 2014. Ms. Kean received her EMT-Basic license at Columbus Hospital, where she was instructed and trained on the proper way to lift patients. *Id*. at 184:11-185:5. After that, Ms. Kean received her paramedic training at Malcolm X College, which included a paramedic internship with the Chicago Fire Department. *Id*. at 183:11-184:7.

Ms. Kean worked at two different ambulance companies and interned for three months as a paramedic at CFD in 1999. *Id*. at 149:14-22, 150:10-16, 155:15-156:13. At Medical Express Ambulance Services, where she worked as a paramedic, Ms. Kean was promoted to shift supervisor and worked as a preceptor, reviewing and training newly licensed paramedics. *Id*. at 193:1-25. Ms. Kean taught EMT basics at Malcolm X College in 2002-2003, and taught Wright College and Triton students while working for Medical Express. *Id*. at 194:3-21.

While working for these ambulance companies, Ms. Kean responded to a variety of medical emergencies. *Id*. at 159:16-160:22. She lifted and extracted people from difficult environments such as apartments where hoarders lived. *Id*. at 163:11-164:6. Ms. Kean lifted patients weighing over 245 pounds every shift. *Id*. at 166:19-24. Kean worked during all Chicago seasons and storms. *Id*. at 171:11-21. The non-emergency calls she worked were as physically demanding as emergency calls. *Id*. at 173:24-174:5.

Ms. Kean worked fourteen-hour shifts at least three times per week. *Id*. at 150:19-25. She worked 24-hour shifts when she interned for the CFD. *Id*. at 158:9-13. Ms. Kean calculates

she worked one thousand shifts as an EMT/paramedic for ambulance companies and has a total of 14,000 hours of experience. *Id*. at 153:8- 155:14.

Dawn Hoard has been an Illinois-licensed paramedic for thirteen years. *Id*. at 279:25-280:10. She went to paramedic academy at Christ Advocate Hospital to obtain her EMT-B license. *Id*. at 285:2-20. Ms. Hoard's training included lifting and maneuvering patients during clinical rotations with Superior Ambulance Company. *Id*. at 286:5-24 When Ms. Hoard graduated she was hired by Superior Ambulance Company as an EMT-B in February 2000. *Id*. at 287:2-14

Ms. Hoard went to school for her paramedic license in August 2000 and graduated in June 2001. *Id*. at 289:7-291:14. Part of Ms. Hoard's training for her paramedic licensed included supervised work with the Oak Law Fire Department. *Id*. at 291:15-292:4. Since 2002, Ms. Hoard has been a preceptor and instructor at the Christ Hospital Academy , teaching CPR, advanced cardiac life support, prehospital trauma life support, advanced medical life support, and basic lifting and patient extraction. *Id*. at 294:1-297:3. Hoard's duties as a paramedic with Superior Ambulance Company included assessing patient needs and transporting them to the hospital. *Id*. at 298:22-299:6. Ms. Hoard worked 16-hour shifts requiring her to lift and carry patients through adverse locations and inclement weather. *Id*. at 301:2-21

Ms. Hoard began working for Dixmoor Fire Department in 2002. *Id*. at 301:22-302:8. She attended fire academy because the Dixmoor Fire Department required its paramedics to be cross-trained. *Id*. at 304:1-12. Ms. Hoard graduated from fire academy and became a firefighter paramedic. *Id*. at 304:22-305:16. While working for Dixmoor Fire Department, Ms. Hoard also received certifications in HAZMAT Awareness and HAZMAT Ops. *Id*. at 305:20-24. Ms. Hoard responded to a variety of medical emergencies including car accidents, drug overdoses,

and gunshot wounds. *Id*. at 307:11-308:8. She worked 24-hour shifts, repeatedly carrying patients without ever receiving any complaints or poor performance reviews. *Id*. at 309:7-18. Ms. Hoard carried patients as large as 400 pounds. *Id*. at 310:6-10.

Michelle Lahalih is currently employed as a licensed fire service paramedic by the Philadelphia Fire Department. Tr. 786: 8-18, Nov. 12, 2014. She received her EMT-B license from Wilbur Wright College in Chicago, where she was trained in various lifesaving techniques as well as lifting and transporting patients. *Id*. at 787:18-788:12. Ms. Lahalih attended Christ Hospital in Oak Lawn, Illinois for her certificate of licensure for an EMT-Paramedic license. *Id*. at 788:18-789:5. Before graduating, Lahalih had to demonstrate lifting and back-boarding patients during her internship with preceptors and her final exam for her paramedic license. *Id*. at 789:25-790:7

Ms. Lahalih worked for CoMed for a year. *Id*. at 788:13-17. At CoMed, Ms. Lahalih worked 12-hour shifts, transporting and treating patients in emergency situations. *Id*. at 791:24-792:12. Lahalih was a CPR instructor for six years, training doctors, nurses and first responders. *Id*. at 790:12-20. She worked for a medical unit in Wrigley Field for eleven years, continuously climbing stairs and ramps to treat various injuries. *Id.* at 792:20-794:12. Ms. Lahalih worked for MedEx for eight to nine years, including during her application to the Chicago Fire Department. *Id*. at 795:3-15.

Approximately three-quarters of Ms. Lahalih's work for MedEx took place within the city of Chicago. *Id*. at 796:4-18. She also treated Hurricane Katrina victims in New Orleans, where she worked 24-hour shifts. *Id*. at 797:1-798:7. While working for MedEx, Ms. Lahalih transported patients up and down staircases. *Id*. at 798:13-20. She has extensive experience transporting patients using a stair chair and a scoop stretcher. *Id*. at 800:1-801:19. While

working at MedEx, Ms. Lahalih transported patients of up to 300 pounds with one partner. *Id*. at 803:15-18.

Stacy Ernst is currently the Chief Paramedic for Lifeline Ambulance Service in Chicago, serving as a paramedic, preceptor and field training officer. Tr. 979:20-980:4, Nov. 13, 2014. She reviews the background and qualifications of most Lifeline Ambulance applicants for EMT and paramedic positions. *Id*. at 980:15-25.

Ms. Ernst attended EMT school in 1992 at Wright College in Chicago. *Id*. at 985:16-986:1. She attended paramedic school at St. Francis Hospital in Evanston. *Id*. at 989:2-7. Paramedic school included clinical time in the emergency room and a minimum 120 hours observation time on an ambulance with a preceptor. *Id*. at 991:7-25.

Ms. Ernst's preceptor was a female paramedic. *Id*. at 993:2-6. She never observed a difference in lifting abilities between the male and female paramedics. *Id*. at 993:7-11. She completed her provisional time requirement as a paramedic in only five months due to the high amount of ALS calls at Lifecare. *Id*. at 994:10-23. After a year at Lifecare, Ms. Ernst worked for two years at Pulse Ambulance in Chicago, working 24-hour shifts in addition to overtime. *Id*. at 995:2-14.

As an EMT, Ms. Ernst typically worked 10-hour shifts. *Id*. at 987:9-16. During a typical 10-hour shift, Ms. Ernst received an average of six or seven calls, all of which required lifting or moving a patient on a stretcher or stair chair. *Id*. at 988:1-15. During a typical 24-hour shift with Pulse Ambulance, Ms. Ernst received an average of 14 to 15 emergency and non-emergency calls, including responses to 911 calls. *Id*. at Pg. 995:17-996:16. She used the same lifting mechanics and techniques regardless of whether a call was emergency or non-emergency. *Id*. at 997:15-18. After Pulse Ambulance, Ms. Ernst worked for MedEx Ambulance from 1998-

2008.  *Id*. at Pg.1000:19-25.  She worked as a field training officer at Pulse and Lifecare, training newly-graduated EMTs.  *Id*. at 1001:4-10.

Ms. Ernst has responded to calls providing medical care while in a moving ambulance.  *Id*. at 1001:11-17.  She has performed CPR, log-rolled patients to stabilize their spine injuries, and used a scoop stretcher to remove patients from difficult environments where a stair chair would not fit.  *Id*. at 1001:18-1004:21.  Ms. Ernst move patients up and down stairs via a stair chair almost every shift. Pg. 1004:22-25.  She has had to lift and maneuver patients out of cramped spaces.  *Id*. at 1006:2-11.  When responding to calls, Ms. Ernst carried various equipment including a stretcher, stair chair, cardiac monitor and oxygen tank.  *Id*. at 1011:9-20.

Irene Res attained her EMT-B license at Columbus Hospital.  *Id*. at 1207:10-14.  There she learned the skills necessary for working on an ambulance, such as CPR, lifting, moving, basic emergencies, and different scenarios in which EMTs encounter patients.  *Id*. at 120:18-25.  Ms. Res joined MedEx Ambulance Services in 1999.  *Id*. at 1211:18-20.  Her job took her into crowded apartments, apartments of hoards, homes with broken stairs, and other dilapidated places.  *Id*. at 1216:3-9.

To get her paramedic license, Ms. Res went to Christ Hospital in Oak Lawn, which lasted for over one year.  *Id*. at 122:6-11.  She graduated in 2001 and continued working at Medical Express, which is where she has continued to work until the present.  *Id*. at 1226:8-25.  There, Ms. Res has worked 24-hour and 12-hour shifts.  *Id*. at 1224:21-25.-

IV.    **Conclusion**

The Court should deny the City's motion and permit the Jury to decide the disparate treatment claim.

///

///

Dated: November 17, 2014						Respectfully submitted,


						*/s/ David Borgen*
						DAVID BORGEN, CA Bar No. 099354
						dborgen@gbdhlegal.com
						Goldstein, Borgen, Dardarian & Ho
						300 Lakeside Drive, Suite 1000
						Oakland, CA 94612
						(510) 763-9800; (510) 835-1417 (Fax)

						SUSAN P. MALONE
						smalonelaw@sbcglobal.net
						542 S. Dearborn Street, Suite 610
						Chicago, IL 60605
						(312) 726-2638

						MARNI WILLENSON
						marni@willensonlaw.com
						542 S. Dearborn Street, Suite 610
						Chicago, IL 60605
						(312) 546-4910; (312) 261-9977 (Fax)

						JOSHUA KARSH
						jkarsh@hsplegal.com
						Hughes, Socol, Piers, Resnick, and Dym
						70 West Madison Street, Suite 4000
						Chicago, IL 60602
						(312) 604-2630; (312) 604-2631 (Fax)


						Attorneys for Plaintiffs

556461.1