| | |
|---|---|
| **STACY ERNST, DAWN HOARD,** ) | |
| **KATHERINE KEAN, MICHELLE** ) | |
| **LAHALIH, and IRENE RES-PULLANO,** ) | |
| ) | |
| **Plaintiff(s),** ) | |
| ) | |
| **v.** ) | **No. 08 C 4370** |
| ) | |
| **CITY OF CHICAGO,** ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
| **Defendant(s).** ) | |

## <u>MEMORANDUM ORDER AND OPINION</u>

In 2008, Plaintiffs Stacy Ernst, Michelle Lahalih, Dawn Hoard, Irene Res, and Katherine Kean sued the City of Chicago for sex discrimination under Title VII of the Civil Rights Act of 1964. They argued that a physical fitness test given to paramedic job applicants by the Chicago Fire Department (CFD) in 2005 was intentionally discriminatory and that it had a disparate impact on women. In 2014, Judge Norgle conducted a bench trial on the disparate impact claims and entered judgment for the City; a jury found for the City on the disparate treatment claims. *Ernst v. City of Chicago*, 837 F.3d 788, 793 (7th Cir. 2016). On appeal, the Seventh Circuit remanded the disparate treatment claim for a new trial, and it directed the district court to enter judgment for Plaintiffs on the disparate impact claim. *Id.* at 807. On remand, the parties stipulated that Plaintiffs would have been hired on April 1, 2005. In August 2017, this court held a three-day bench trial on the disparate impact damages. Final resolution of Plaintiffs' disparate treatment claim has been stayed pending the determination of the disparate impact damages. (Proposed Scheduling Order [676], at 3; Transcript [670], at 3:22–4:6.) The parties are directed to prepare a proposed judgment order in accordance with the findings below.

**BACKGROUND**

I.      **Chicago Fire Department Paramedic Hiring Process**

Analysis of this ten-year-old case begins with a description of the process by which the Chicago Fire Department ("CFD") hires paramedics. The fire department hiring plan[1] requires that CFD process applications through the City's Department of Human Resources ("HR"). (Tr. 732:3–4 (Deputy Commissioner Owen[2]); Ex. J16.) When the fire department determines that it has vacancies to fill, HR staff prepare a job posting and accept applications for paramedic positions, creating a list of candidates who are appropriately credentialed. (Tr. 732:3–11 (Owen).) HR then provides CFD with an eligibility list containing the names of those who "are to be considered next in the [hiring] process." (Tr. 732: 10–22 (Owen). *See also* Tr. 614:11–15 (Bryant)); Tr. 624:16–625:12 (Bryant) (describing the referral list process).) Certain exceptions to the hiring plan—for example, settlements or judgments in litigation—allow CFD to hire paramedics outside of the eligibility list; otherwise, paramedics are "supposed" to be hired from the eligibility list. (Tr. 732:21–22, 737:10–21 (Owen); Ex. J16, at PL-D00043.) CFD paramedic eligibility lists were opened at least three times between 2004, when the Plaintiffs applied, and the 2017 damages trial: in 2004, 2007, and 2011. (Ex. P129; Tr. 258:13–261:6 (Ernst).) From each list, CFD may call multiple paramedic training academy classes. (*See* Tr. 705:20–706:1 (Vasquez); Ex. J10.) Each list need not be completely exhausted before a new list is opened; when that happens, the older list is retired and candidates who were not called but remain interested must reapply. (*See* Tr. 259:3–8 (Ernst).)

---

[1]     This hiring plan was developed as part of the *Shakman* decrees, which have required the development of strict hiring plans across many public sectors in the City of Chicago over the last few decades. (Tr. 733:20–734:5 (Owen).) *See Shakman v. Democratic Org. of Cook Cnty.*, 481 F. Supp. 1315, 1320-21 (N.D. Ill. 1979), vacated sub nom., *Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987).

[2]     For clarity, throughout the opinion the court will identify the witness to whom each portion of cited testimony pertains.

In order to maintain an appropriate number of paramedics, fire department officials monitor current and upcoming paramedic vacancies. As the Deputy Fire Commissioner Anthony Vasquez explains, "When the numbers [of vacancies] get close to a full class . . . in the training academy, recommendation will be made to the fire commissioner that we have a [paramedic training] class." (Tr. 680:3–6 (Vasquez).) After review and approval from the City's budget office, CFD invites a group of candidates from the eligibility list to attend "initial processing." (Tr. 595:24 (Bryant); Tr. 680:17–681:20 (Vasquez).)

At processing, candidates turn in paperwork, "they are photographed and fingerprinted, [they are] drug tested . . . and they're informed . . . about the process" for becoming a CFD paramedic. (Tr. 596:11–15 (Bryant).) From 2000 through at least 2009, processed paramedic applicants next took a physical skills test ("PAT"). *Ernst*, 837 F.3d at 792 ("Between 2000 and 2009, nearly 1,100 applicants took [the PAT] entrance examination."). In 2014, the City replaced the previous PAT with a new physical skills test—the "Avesta" test. (Ex. J33, at PL-D00052; Tr. 587:14–19 (Bryant).) These physical tests act as gatekeepers to the next step of the hiring process: If applicants fail the PAT or Avesta, they do not become CFD paramedics.[3] If they succeed, they receive a conditional job offer and may become part of the fire academy class. (Ex. D89 ("The Chicago Fire department is pleased to extend you a <u>conditional</u> offer of employment as a Probationary (Candidate) Fire Paramedic. This offer is conditioned upon your successfully completing . . . the medical examination. . . . This offer is further conditioned upon the availability of an open position in a training class at the Chicago Fire Academy.") (emphasis in original).) The court understands that beginning with their entrance into the academy,[4] new hires must complete

---

[3]    If an applicant fails the physical skills test, she can still apply for placement on a new eligibility list when it opens.

[4]    The academy involves academic training, physical training, and "ride time" on an ambulance. (Tr. 687:20–690:7 (Vasquez).) It can vary in length. (Tr. 687:1–9 (Vasquez) (Q. . . . "[H]ave you determined yet how long that class will last?" A. "No. I'm not sure, because it varies. There is a coordination effort that takes place with regard to ensuring that the proper trainers and instructors are available for certain times. So it takes a coordinated effort to have an academy

a nine-month probationary hire period.  (Tr. 539:23–540:3 (Porter) (noting the nine-month probationary period).)  During that period, they may be fired for any reason, and they may not maintain any secondary employment.  (Tr. 700:11–701:4 (Vasquez).)

In 2004, Plaintiffs Ernst, Lahalih, Hoard, Res, and Kean applied for paramedic jobs with the Chicago Fire Department.  *Ernst*, 837 F.3d at 792.  The department called and processed each plaintiff, and each took a pre-hire physical abilities test designed by Human Performance Systems, Inc. (the "PAT").  Each Plaintiff failed the PAT.  *Ernst*, 837 F.3d at 792.  The Seventh Circuit ruled in 2016 that the PAT had an unjustified disparate impact on women-applicants and ordered the district court to enter judgment on that issue.  *Ernst*, 837 F.3d at 805.  On remand, the parties stipulate that, but for discrimination, "each Plaintiff would have been hired as a firefighter paramedic on April 1, 2005."  (Proposed Scheduling Order [676], at 2.  *See also* Transcripts of Trial Proceedings ("Tr.") [739], at 4:23–25.)

## II.     The Plaintiffs

Since 2005, each Plaintiff has maintained steady employment.  With the exception of Ms. Lahalih, who took a brief hiatus from the paramedic field, all five plaintiffs have worked and continue to work in positions that require a paramedic license.  Their individual circumstances are described below.

### A.     Ms. Ernst

Plaintiff Stacy Ernst is currently the chief paramedic at LifeLine Ambulance, where she has worked since October 2008.  (Tr. 242:13–15, 246:7–9 (Ernst).)  That company "provides emergency and non-emergency transport of the sick and injured throughout the City of Chicago" and to the "entire metropolitan region."  (*Id.* at 242:17–19 (Ernst).)  Her duties at LifeLine include acting as "the liaison for the company with the . . . Illinois Department of Public Health," "hiring

---

start time and academy end time for a host of people that have their own schedules and that we have to accommodate.").)

EMTs, EMT-Bs, and paramedics," supervising those employees, and overseeing "ambulance, licensure, stocking of the vehicles, [and] compliance with region and state equipment directives." (*Id.* at 242:21–243:12 (Ernst).)  As of August 2017, Ms. Ernst was managing 38 ambulances and "anywhere from 140 to 185 employees." (*Id.* at 243:14–17 (Ernst).)  Some of her employees at LifeLine are CFD paramedics who work second jobs with LifeLine—some of these employees are CFD paramedics-in-charge, and one, Ms. Ernst's brother, is a CFD Ambulance Commander. (Tr. 243:20–244:17 (Ernst).)

As the chief paramedic, Ms. Ernst is in the "highest position at the company, unless the CEO or the COO leaves," and she did not anticipate either leaving at the time of this trial. (*Id.* at 246:25–247:3 (Ernst).)  At LifeLine, she does not receive retirement benefits, and she is earning a lower salary than she would at CFD, had she been hired in April 2005. (*Id.* at 249:14–23 (Ernst).) Ms. Ernst has also maintained secondary employment at the University of Illinois at Chicago while working at LifeLine. (Tr. 250:21–25 (Ernst).)

Prior to her employment at LifeLine, Ms. Ernst worked as a paramedic, paramedic preceptor, and field training officer[5] at Medical Express Ambulance ("MedEx").[6] (*Id.* at 247:12–17.)  Ms. Ernst was employed at MedEx from February 1998 through the time she began at LifeLine. (Tr. 248:21–23.)  At no point since 2005 has she been unemployed (*id.* at 248:24–249:1), and she has continued seeking employment with CFD:  Ms. Ernst appears to have applied for every CFD paramedic hiring opportunity since 1996. (Tr. 258:13–261:6 (Ernst) (noting her applications in 1996, 2000, 2004, 2007, and 2011).)

### B.    Ms. Hoard

---

[5]      Ms. Ernst explains that "[p]aramedic preceptors evaluate and train new paramedics, once they finish paramedic school and first obtain their paramedic license." (Tr. 247:22–24 (Ernst).)  Field training officers also serve in training roles. (*Id.* at 248:1–16 (Ernst).)

[6]      The court will refer to Medical Express Ambulance as MedEx. (*See, for example*, Tr. 247: 12–14 (Ernst) ("A. I worked for Medical Express Ambulance. Q. And is that sometimes referred to as MedEx? A. Yes, ma'am.").)

Plaintiff Dawn Hoard is currently an emergency room technician at the University of Chicago Comer Children's Hospital.[7] (Tr. 202:25–203:4 (Hoard).) She has worked there since 2005, and her duties include providing pre-triage and first responder-type care to patients who arrive at the emergency room.[8] (*Id.* at 204:18–205:23.) There are no higher-paying promotions available to her in this role, and she receives a pension smaller than one she would have received at CFD. (Tr. 207:25–208:1(Hoard); Exs. J22, J32; Ex. P115, at a 7.)

Ms. Hoard has also worked, "sporadic, intermittent" side jobs since 2005. (Tr. 202:22 (Hoard).) She has worked as a paramedic preceptor at Christ Advocate Hospital and as a paramedic class instructor. (Tr. 202:16–20 (Hoard).) She has also worked as a paramedic during White Sox games and at the United Center. (*Id.* at 203:6–8.) Finally, she did some limited non-paramedic office work for her sister. (*Id.* at 203:17–19.) None of this employment has affected her primary employment with the University of Chicago. (*Id.* at 203:20–24.)

Prior to her current position, Ms. Hoard was employed at Dixmoor Fire Department, where she held positions as a paramedic, firefighter/paramedic, and then lieutenant firefighter. (*Id.* at 201:6–16.) She was employed at Dixmoor when she applied for a position with the CFD in 2004. (*Id.* at 200:21–201:1.)

### C. Ms. Kean

Plaintiff Kathy Kean works for the Office of Emergency Management and Communications (OEMC) of the City of Chicago. She began as a call taker at OEMC in December 2005. (Tr. 148:18–21 (Kean).) She applied for a promotion to fire dispatcher as soon as she was eligible. (*Id.* at 151:6–7 ("I believe the timeframe was 18 months from call taker to dispatcher.").)

---

[7] Though Ms. Hoard's job title does not include "paramedic," the court understands that her paramedic license is active and she still works under that license. (Tr. 200:1–8 (Hoard).)

[8] Though Comer is a children's hospital, Ms. Hoard testified that her job can entail providing assistance to adults as well. (*See* Tr. 205:14–17 ("Recently we had some pregnant women come in and their babies were in their pants, so, I mean, we had to rush them into our trauma room."); 207:4–6 (explaining that if "someone comes in with a heart attack, we're not gonna shoe [sic] them away to the adult side across the street. We have to take care of them.").)

Promotions at OEMC require a written exam, an interview, and then candidates are "put on a list" which "goes strictly by seniority." (*Id.* at 151:13–14.) Thus, though Ms. Kean applied for a promotion to OEMC dispatcher as soon as she was eligible, she was not promoted to dispatcher until 2011. (*Id.* at 151:21.)

Due to budget cuts, Ms. Kean was subsequently demoted for "a year or so" and then re-promoted. (*Id.* at 151:21–23 (Kean).) As the court understands the evidence, Ms. Kean has not applied for the next promotion available at OEMC, "which would be a senior position." (*Id*. at 151:1–2.) Ms. Kean testified there are few senior positions available, and that she is lower on the seniority ranks at OEMC. (Tr. 154:21–155:19, 155:22–23 (Kean) (testifying that "there's probably like 20 or 30 people ahead of me" in terms of seniority).) She remains hopeful that "in the next couple of years" some people will retire and she can get "put on the [promotions] list somewhere with seniority." (Tr. 156:2–4 (Kean) (explaining that "not everybody is going to take the test" required for promotion").) Still, she is not sure when such a test will be offered, nor does she know where she will stand in terms of seniority ranking. (*Id.* at 156:5–10 (Kean).) Throughout her time at OEMC, Ms. Kean has maintained her paramedic license. (Tr. 148:4 (Kean).)

Before joining OEMC, Ms. Kean worked at MedEx. There, she held positions of paramedic, paramedic preceptor, and supervisor. (Tr. 156:20–25, 159:2–4 (Kean).) As a supervisor, she managed approximately 30 ambulance crews. (Tr. 160:24–25 (Kean).) She also worked as an EMT trainer at Malcolm X College. (*Id.* at 159:6–7.) Ms. Kean has not been unemployed since applying for a paramedic position with CFD. (Tr. 158:3–6.)

### D.  Ms. Lahalih

When Plaintiff Michelle Lahalih applied for a paramedic position with CFD in 2004, she was employed at MedEx and also worked at Wrigley Field in the first aid branch of security. (Tr. 98:10–23 (Lahalih).) She continued in those positions after she failed to be hired by CFD. (Tr. 100:23–101:25 (Lahalih).)

In the fall of 2007, Ms. Lahalih moved to Philadelphia. She explained that she "decided that [she] needed new - - a new slate and decided to try to move and get a clear head and try to see [where her] career path could take [her]." (Tr. 102:18–20 (Lahalih).) She also wanted "a change of pace, a change of scenery." (Tr. 102:24–25 (Lahalih).) She had a friend living in Philadelphia at the time, and within "about a week" of leaving her jobs in Chicago and moving to Philadelphia, she had secured employment as a barista at a Starbucks. (Tr. 103:1–24 (Lahalih).) From Starbucks, Ms. Lahalih went to work in loss prevention at an IKEA store. (Tr. 104:10–21 (Lahalih).)

By 2008, Ms. Lahalih had become a paramedic with the Philadelphia Fire Department, and she has worked there since. (Tr. 107:2–5 (Lahalih).) She has applied for promotions within that fire department for the rank of lieutenant, but she twice failed the written component of the promotion test and had not achieved a promotion as of the August 2017 trial. (Tr. 126:7–9.) The Philadelphia Fire Department offers Ms. Lahalih a pension, and she intends to retire when she becomes eligible to receive that pension in 2028. (Tr. 126:125–127:10 (Lahalih).)

At the time of this trial, Ms. Lahalih was living with her husband and two children in Philadelphia. She does not have an Illinois paramedic license—when she left the state, she transferred her license to Philadelphia and has not maintained an Illinois license. (Tr. 125:20–126:3 (Lahalih).)

E.     Ms. Res

Plaintiff Irene Res[9] is currently a paramedic and operations supervisor at MedEx. (Tr. 449:22–24, 150:1 (Res).) She has been in that role since October 2007. (Tr. 453:19 (Res).) As a supervisor, she is "in charge of ambulance licensing [and] compliance," "scheduling," "supervis[ing] all of the EMTs and paramedics that are working for the company," and for "fill[ing]

---

[9]     Ms. Res is referred to as Irene Res-Pullano or Irene Res Pullano in some filings. Because her counsel refers to her as Ms. Res, the court will do the same.

shifts on the ambulance." (Tr. 150:12–19 (Res).) Ms. Res supervises CFD paramedics, CFD paramedics-in-charge (PICs), and at least one CFD Ambulance Commander who works part-time with MedEx. (Tr. 151:5–6 (Res) ("A. Yes. We have PICs from the fire department. Q. Do you also have a Chicago Fire Department ambulance commander who works some shifts at MedEx? A. Yes. We've had a couple of them, actually.").)

Ms. Res began working at MedEx in 1999 as an EMT.[10] (Tr. 453:9 (Res).) While working there full-time, she went back to school to get her paramedic license, and then became a paramedic with the company. (Tr. 453:9–16 (Res).) She worked as a paramedic until she was promoted to her current supervisor position. (Tr. 454:13–18 (Res).) She believes there are no other promotions in the company available to paramedics, and testifies that MedEx makes "a very small contribution" to a 401k plan. (Tr. 453:23–454:7 (Res).)

Irene Res, like Ms. Ernst, continued to apply for a paramedic position with CFD after she failed the PAT in 2005. (Tr. 467:23–25 (Res).) She applied for the 2007 eligibility list, was called, took the same PAT, and again failed. (Tr. 467:23–468:8 (Res).) She applied again for the 2011 eligibility list. (Tr. 468:15–17 (Res).) It is not clear whether she was called to process from that list.

Ms. Res is also currently the owner of a bakery that previously belonged to her father, who is now in ill health. (Tr. 456:11–25 (Res).) She "took over" the bakery in August 2014, and she does much of her bakery work from home. (Tr. 456:6–18 (Res).) While she employs managers at the bakery (Tr. 504:11–20 (Res)), she needs to be there "a few hours a week." (Tr. 511:22–23 (Res).) Her income from the bakery fluctuates; she testified that she "did have one good year" but that "[t]his year is not really looking as good as last year did." (Tr. 458:10–11; 505:5–15 (Res) (noting that Ms. Res made approximately $70,000 from the bakery in 2015); 505:22–25 (noting

---

[10] Before joining MedEx, Ms. Res worked full time at a dentist's office. (Tr. 510:15–13; 511:1–3 (Res).) She also worked at and helped her father with his bakery business. (Tr. 509:1–511:8 (Res).)

that she made $92,500 from the bakery in 2016).)  Her work at the bakery has not affected her work at MedEx, and MedEx continues to be the source of her medical insurance and benefits. (Tr. 457:17–19, 21 (Res).)  She has also "worked other side jobs" since 2005.  (Tr. 459:13 (Res).)

With these background facts laid out, the court turns to the contested legal and factual issues.

## AVAILABLE REMEDIES

Title VII's "primary goal . . . is to end discrimination."  *Ford Motor Co. v. E. E. O. C.*, 458 U.S. 219, 230 (1982).   The statute's remedial scheme aims to make victims of unlawful discrimination whole and to restore them "to a position where they would have been were it not for the unlawful discrimination."  *Id.* (citing *Albemarle Paper*, 422 U.S. at 421).  *See also Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952 (7th Cir. 1998) ("[T]he remedial scheme in Title VII is designed to make the plaintiff whole.") (quoting *McKnight v. General Motors Corp*., 908 F.2d 104, 116 (7th Cir.1990)).  In making a victim whole, "[c]omplete relief . . . generally will include an award of back pay."  *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1580 (7th Cir. 1997) (noting that back pay is "presumptively proper") (citations omitted).   The court may also order prospective relief, such as instatement, reinstatement, or front pay.  *Williams*, 137 F.3d at 951–52; 42 U.S.C. § 2000e-5(g)(1).   Still, a district court should not "catapult [plaintiffs] into a better position than they would have enjoyed in the absence of discrimination."  *Ford*, 458 U.S. at 234.

## BACK PAY

District courts have "broad equitable discretion to award back pay."  *Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003)).  "Backpay is a reasonable estimate of the harm suffered as a result of [the adverse employment action], determined by (1) measuring the difference between actual earnings for the period and those which she would have earned absent the discrimination by [the] defendant and (2) reducing that amount if the defendant can show failure to take reasonable efforts to mitigate her damages."  *Equal Employment Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 629 n.6 (7th

Cir. 2018) (modifications in original) (internal quotation marks omitted) (quoting *Horn v. Duke Homes*, 755 F.2d 599, 606–08 (7th Cir. 1985).

The burden of establishing entitlement to back pay first falls to the plaintiff. *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994); 7th Cir. Pattern Jury Instr. 3.11 ("If you find that Plaintiff has proven his claim of [discrimination] by a preponderance of the evidence, you may award him as damages any lost wages and benefits he would have received from the Defendant."). Defendant bears the burden of showing "that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts." *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1255 (N.D. Ill. 2015), *aff'd*, 842 F.3d 1010 (7th Cir. 2016).

I.      **Duty to Mitigate**

Defendant City argues that Plaintiffs failed to mitigate damages. First, the City argues that Plaintiffs Kean, Hoard, and Lahalih failed to mitigate when they did not apply for the paramedic eligibility lists opened in 2007 and 2011. Second, the City argues that each Plaintiff failed to mitigate damages in 2014, when CFD offered each Plaintiff an "opportunity to process."

A.      **Pre-2014 Failures to Re-apply**

The court has little difficulty concluding, initially, that all Plaintiffs satisfied their duty to mitigate damages through 2014 by using "reasonable diligence in finding other suitable employment." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989) (citations omitted). By 2005, each woman either continued in her previously-held job or found another job in which she utilized her paramedic skills, and none spent any significant time unemployed. During that period, the City continued to use the discriminatory PAT, and it continued to defend the legitimacy of that test through the 2016 Court of Appeals hearing. Plaintiffs here had found comparable employment sufficient to mitigate damages, and they were not required to reapply for paramedic positions through a door that remained closed by the challenged PAT. *See United States v. City of Warren, Mich.*, 138 F.3d 1083, 1089 (6th Cir. 1998) (finding that "[n]o established authority requires Title VII claimants who have found comparable employment to reapply for

positions with employers who have previously refused to hire them for discriminatory reasons"). *Cf. Grace v. City of Detroit*, 216 Fed. Appx. 485 (6th Cir. 2007) (per curiam) (holding, in an Equal Protection Clause right-to-travel case explicitly limited to its facts, that plaintiffs who did not re-apply for police officer jobs with the City of Detroit *after* the City eliminated a residency requirement failed to satisfy their duty to mitigate). The court concludes that all Plaintiffs satisfied their duty to mitigate while the PAT was in place.

### B. 2014 Offers to Process

#### 1. The 2014 Offers

In 2014, the City replaced the PAT with the Avesta test, and, then, five-and-a-half years into the litigation, the City invited all five Plaintiffs to "process" for paramedic positions without requiring Plaintiffs to be called from the eligibility list, and without requiring them to apply.[11] (Tr. 622:16–25 (Bryant).) The City's attorney reported in a March 24, 2014 e-mail to Plaintiffs' counsel that "[t]he CFD plan[ned] to begin a class of approximately 100 paramedics in August 2014." (Ex. J36.) In the same e-mail, the City announced that its "vendor ha[d] completed its validation study of a paramedic PAT, and ha[d] selected and validated the test developed by Avesta Corp." (*Id*.) Thus, though not conceding that the PAT had had a discriminatory impact, the City advised Plaintiffs' counsel that it was no longer using the PAT.

The hiring packet subsequently sent to each Plaintiff contained, among other things, a job application, a background questionnaire, and three pages of information on the Avesta test, including a link to a video of the test and a brief description of each of the twelve steps in the test. (Ex. J33.) By Deputy CFD Commissioner Bryant's admission, these were not job offers. (Tr. 622:17–21 (Bryant) ("Q. And you understand that this was a job offer to the plaintiffs; is that

---

[11] The invitation to process came after Judge Norgle, to whom the case was assigned, had set and stricken two trial dates. ([223], [251], [300], [386].)

correct? A. No. Q. It's not a job offer? A. No."); Ex. J33 ("**THIS IS NOT AN OFFER OR GUARANTEE OF EMPLOYMENT**") (emphasis in original).)

CFD held an "initial processing session" on April 10, 2014, which plaintiffs were to attend if they wished to process. (Tr. 262:25–263:1 (Ernst).) At that session, Keyanna Hammond, an administrative service officer of the CFD, informed applicants that they "would have to return [ ] medical release forms as soon as possible." (Tr. 712:6–8 (Hammond). *See also* 726:14–16 ("Q. And you also told [applicants] that they could bring the form with them to the Avesta test; is that correct? A. Yes.").)

CFD then held Avesta "practice" sessions on May 29 and May 30, 2014.[12] (Tr. 599:10–12; 600:4–6 (Bryant).) Ms. Hammond did not recall at trial whether she informed applicants about these practice sessions at the April 10 processing, nor did she recall having instructed applicants that they would need a medical release to attend the practice. (Tr. 726:25–727:11 (Hammond). For her part, Ms. Ernst recalled that "[t]here was no mention of a practice session on April 10th." (Tr. 236:7–8 (Ernst).) The City did, however, eventually contact the Plaintiffs through their counsel to inform them of the practice session and of the need for a medical release in order to participate. (Tr. 264:11–16 (Ernst); Tr. 599:13–17 (Bryant).)

At the practice session, applicants "check[ed] in with [CFD] staff." (Tr. 599:2 (Bryant).) The vendor then showed applicants a video, took questions, and showed applicants "the actual test area." (Tr. 599:6–9 (Bryant).) Applicants were not permitted to touch or use certain pieces of the test equipment. Ms. Ernst recalls "that you were not allowed to touch [ ] the stretcher at the back of the ambulance" in the test room." (Tr. 265:12–14.) They were, however, able to practice with other stations such as the "CPR manikins" and the "dummy roll." (Tr. 265:17–266:1 (Ernst); Tr. 475:7–14 (Res) ("I don't remember the other stations, but there was a couple stations that I was interested [sic] that you were allowed to, or at least I did, touch.").) Still, the practice session

---

[12] While CFD checked in the applicants, "the vendor actually" ran the practice session. (Tr. 599:1–5 (Bryant).)

was essentially a preview, not a practice test. (Tr. 475:3–4 (Res) ("Q. So there was no run-through of the entire test? A. No. No. There was no run-through.").)

CFD administered the Avesta test on June 2, 2014. (Tr. 600:15–17 (Bryant).) CFD personnel were present at the test site, but the Avesta vendor conducted the test. (Tr. 600:15–23 (Bryant).) An applicant who passed the Avesta test would receive a "conditional offer of employment and an opportunity to schedule a medical appointment." (Tr. 602:22–23, 623:5–624:14 (Bryant); Ex. D89 (listing the conditions of the offer, including passing the medical examination, "meet[ing] any of the required standards," being able and willing "to begin training on the date designated by the Fire Department," and "the availability of an open position in a training class at the Chicago Fire Academy").) The medical appointment includes "vision, hearing, cardiac [screening] . . . [and] a stress test." (Tr. 603: 16–17 (Bryant).) CFD would also conduct a background check. (Tr. 602:24–603:8 (Bryant).) An applicant who passed each of those steps would be "offered a position in" an upcoming CFD paramedic academy training class. (Tr. 723:20–23 (Hammond).)

### 2. Plaintiffs' Responses to the 2014 Invitations to Process

Two of the Plaintiffs—Ms. Lahalih and Ms. Kean—did not attend the April 10, 2014 initial processing session. The remaining three Plaintiffs—Ms. Hoard, Ms. Res, and Ms. Ernst—attended the initial processing session but were not awarded a position in the paramedic training class.

Ms. Lahalih, who was living in Philadelphia, had an infant at home. He was born in mid-December 2013 via C-Section. As of March 2014, Ms. Lahalih had come back to her job with the Philadelphia Fire Department, but was "still doing third-person ride along time" where there was "someone to observe [her] doing [her] job correctly for a period of time before [she] came back to full duty." (Tr. 112:14–113:21 (Lahalih).) She no longer had a valid Illinois paramedic license, as she had transferred it to Pennsylvania, and she could not meet the Chicago residency requirement for CFD paramedics. (Tr. 115:16–116:3, 116:11–17 (Lahalih).) Ms. Lahalih worried

about the time she would have to take off work and the costs associated with traveling back and forth to Chicago—she estimated that she would have to come to Chicago "three to five times, if not more" in order to take advantage of the 2014 processing opportunity. (Tr. 119:17–121:7, 143:21–143:9 (Lahalih).) Finally, although her employer's medical doctors had cleared her to return to work, Ms. Lahalih was concerned about taking the Avesta test several months after her C-section. (Tr. 121:10–16, 132:22–24, 141:11–20 (Lahalih).) The parties stipulated that Ms. Lahalih could have come to process on April 23, instead of April 10. (Tr. 131:24–132:2.) Ms. Lahalih did not attend either date.

Ms. Kean, an employee of the City's Office of Emergency Management and Communications, expressed deep skepticism regarding the City's 2014 offer to process. She did not attend the 2014 processing because she didn't believe it was an offer of employment. (Tr. 164:19–20 (Kean).) She did not trust that the City was providing her a true opportunity, and she did not want to "jeopardize" the pending 2014 trial by providing the City with more information about herself through processing. (Tr. 164:19–20 (Kean) ("[T]his is not an offer of employment."); 166:3–4 ("I don't trust what's happening and I wasn't going to stick my neck out and jeopardize our trial."); 167:19–20 (explaining her concern with providing the City additional personal information with ("[t]he trial hanging over our heads and not knowing when this thing was gonna take place"); 193:22–25 ("Q. You were concerned it would [impact your case]? A. Right. Q. And so, you didn't submit that application right? A. Correct.").)[13] Further, she was concerned that she might make it through the process to the CFD training academy, at which point she would

---

[13] *See also* Tr. 177:4–7 (Kean) (responding to a question from defense counsel: "Q. Is it your position that providing all of these [2014 application] documents to the department would have been overly burdensome for you to complete the application process? A. Not burdensome, but informative for you.").

have to quit her OEMC dispatcher job, and then not make it through the academy, leaving her jobless with a disabled daughter to care for.[14]  (Tr. 172:3–173:15 (Kean).)

Ms. Kean's concerns about the City's request for work histories and background checks during processing require context.  Two months before the City extended Plaintiffs the offer to process, which would require them to provide references and to submit to extensive background checks, Defendant City had issued new subpoenas to Plaintiffs' current and former employers for employment records and documents.  (Plaintiffs' Motion to Quash Subpoenas [318], at Ex. 2.)  Plaintiffs moved to quash, Defendant withdrew the subpoenas, and the magistrate judge directed Defendants to "to immediately return all documents."  (Minute Entry [326].)  The magistrate judge also directed that "[n]one of the information that may have been obtained from the subpoena may be used at trial."  (Minute Entry [326].)  The City's offers to process followed shortly after the subpoena's withdrawal.  Ms. Kean was aware of these proceedings.  (Tr. 190:6–9 (Kean).)  Some of Ms. Kean's co-plaintiffs, discussed below, found a way around these concerns; they did not fill out a new application packet.  Instead, they re-submitted their applications from 2004 with little updated information, but Ms. Kean did not.  (*See* 187:12–15 (Kean); Exs. D93, D94, D95.)

Ms. Hoard did attend the April 10 processing.  She, like Ms. Kean, was skeptical of the City's intentions: "I really didn't think that they were going to offer us - - it seemed kind of fishy because it was so last minute.  But I just thought that, okay, what the heck, I'll put my hat in the bowl, you know. . . . I didn't trust the city very much."  (Tr. 210:11–16 (Hoard).)  She turned in her application at processing with a letter explaining that she was attaching her 2004 application, providing limited additional information, and explaining that she would not sign the application's background questionnaire "[o]n the advice of counsel."[15]  (Ex. D94, at ERN019720.)

---

14    Ms. Kean is the sole caretaker for a daughter suffered a traumatic brain injury in 2015.  Ms. Kean explains that her daughter "is getting better" and hopes that she will "continue[ ] to get better."  (Tr. 171:9–10 (Kean).)

15    That letter further explained: "I am ready to proceed with all other processing elements including the physical test and medical without waiving in any manner any of the claims

At processing, Ms. Hoard recalls learning that she would need a medical release in order to take the Avesta test, and she scheduled an appointment with her doctor for May 31, 2014. (Tr. 212:20–213:9 (Hoard).) This was before she learned of the May 29 practice session. (Tr. 213:20–22 (Hoard).) When she went to the practice session, she told "the woman at the front desk" that she had not yet had her medical release appointment (Tr. 215:5–8 (Hoard); 714:20–714:5 (Hammond)), and that woman then refused to permit Ms. Hoard to participate in the practice session. (Tr. 216:2–4 (Hoard) ("And she says, well, I can't let you stay here, it's a liability. I'm like, can't I just step in and look around? And she's like, no, I can't do that, it's a liability."); Tr. 714:6–10 (Hammond) ("Q. Was Ms. Hoard allowed to take the practice test? A. No. . . . "[S]he needed the medical release form to even touch the equipment."); Ex. D84 (sign in sheet showing that Hoard "failed to comply").)

Ms. Hoard proceeded with her scheduled May 31 doctor's appointment and got her medical release. (Ex. 18; Tr. 218:8–10 (Hoard).) She did not attend the June 2 Avesta test, however, because she concluded that being turned away from the practice session meant that the City was not providing her with a "true opportunity." (Tr. 219:21 (Hoard); *id.* at 220:13–15 (Hoard) ("Q. And being turned away on the 29th of May, did that tip the scales in your thinking? A. It did. I just felt like I couldn't trust them. I couldn't trust the fire department.").) She also felt she "was totally gonna be at a disadvantage" because she had not been able to participate in the practice session. (Tr. 219:23–24 (Hoard).)

Ms. Res attended processing because she's "an optimist." (Tr. 472:10 (Res).) She got her medical release before the practice session, and she attended the practice session. (Tr. 474:10–11 (Res); Ex. J41.) At the practice session, applicants were not allowed to practice on the stretcher station. (Tr. 475:10–11 (Res) ("[T]hey said we couldn't touch it.").) Both Ms. Ernst

---

in the currently pending action. . . . It is also my understanding that you are not making an unconditional offer of employment and do not intend this in any manner as an offer of such employment." (Ex. D94, at ERN019720.)

and Ms. Res, the only two Plaintiffs to participate in the practice session and the Avesta test, noted that the ambulance seemed higher off the ground than an ambulance would be "under normal working conditions."[16]  (Tr. 267:2–9 (Ernst) ("It appeared to be high, higher than it normally is when you work out on the streets actually taking patients in and out.").)  This would ultimately be problematic for Ms. Res, who is only 5' 3".  (Tr. 480:13–14 (Res).)

Ms. Res did not pass the Avesta test because she was unable to get the stretcher into the Ambulance in the last station of the test—she was unable to lift the stretcher high enough to push it in.  (Tr. 715:11–17, 716:11–20 (Hammond); Tr. 476:8–17 (Res) ("I knew that [the ambulance] was higher than what we usually do on the street. . . . I literally had to put the stretcher way - - pretty much past my shoulders to get that stretcher in.").)  She testified that she attempted to put the stretcher into the back of the ambulance three times.  (Tr. 476:8–477:4.)  On the third attempt, the test administrator stopped her.  (Tr. 477:3–4 (Res).)  At the conclusion of the test session, Ms. Bryant provided Ms. Res with a notice stating that she "did not receive a passing score on the Paramedic Physical Abilities Test (PPAT)."  (Ex. D72 (emphasis removed); Tr. 608:9–11 (Bryant).)  The letter also informed her that she would "remain on the applicant list and [would] be offered one additional opportunity to take the [Avesta] PPAT should the list continue to be used." (Ex. D72.)

According to Ms. Hammond, Ms. Res did receive an opportunity to re-test in October 2014. (Tr. 717:16–18, 718:18–22 (Hammond).)  In support of this contention, the City cites an e-mail sent to Ms. Res, dated October 7, 2014.  (Ex. J37 (notifying Ms. Res via e-mail that she "must report for the Chicago Fire Paramedic physical ability practice session on Tuesday, October 28, 2014, at 2:30pm").)  As the court reads that message, however, the City was not offering Ms. Res

---

[16]     In opening argument, Plaintiffs' counsel explained that ambulances are on hydraulics, so the back is lowered to 30.5 inches when taking patients in and out.  The ambulance in the Avesta test did not have the back lowered as it would be in practice.  (Tr. 30:20–31:5.)  The Plaintiffs offered no testimony to this effect, however.

a *testing* opportunity; instead, it directed her to report for a "physical ability *practice session* on October 28, 2014" and warned her that a failure to do so would "result in [her] name being removed from the Paramedic eligibility list." (Ex. J37 (emphasis added).) Ms. Res concluded that this e-mail regarded only a practice session, which she did not believe would help her given that she would not be permitted to touch the stretcher, and she forwarded the e-mail to her attorneys.[17] (Tr. 481:11–18, 491:23–24, 492:21–25 (Res).) She testified that she did not read the entire e-mail and acknowledged that "[t]hat was a mistake in hindsight." (Tr. 492:21–493:9 (Res).) The court notes, however, that the e-mail does not explain or even suggest that the session would be an actual Avesta test. Ms. Res did not attend the October 28 practice session. (Tr. 719:4–5 (Hammond); Tr. 495:5 (Res).)

The next communication for Ms. Res came in the form of an e-mail from the City's counsel to Plaintiffs' counsel on October 28, 2014: "We have been advised that Ms. Res was scheduled for a paramedic PAT (Avesta) *retest* today, did not show and did not contact the CFD in advance." (Ex. D73 (emphasis added).)[18] In that e-mail, the City asked Ms. Res to contact "the personnel department, Keyanna Hammond (Keyanna.Hammond@cityofchicago.org) or CFD personnel at (312) 746-6923." (*Id.*) The City again e-mailed Plaintiffs' counsel two days later. In an October 30 message, the City warned, "The CFD has not heard from Ms. Res-Pullano . . . Tomorrow is the last day she can be tested in the current round."[19] (Ex. D74.) Ms. Res never contacted the

---

[17]     Ms. Res "was under the impression that [CFD was] going to have communications only with [her] attorneys." (Tr. 481:16–18.) This was a reasonable belief, given the letter attached to Ms. Res's application for the 2014 processing opportunity. That letter stated: "Please note that due to the pending litigation, all communications must at this time be forwarded to my attorneys who will provide them to me." (Ex. D95, at ERN019731.)

[18]     To the extent Plaintiffs object to Exhibits D73, D74, and D75 as hearsay, the court does not consider the e-mails for the truth of the matter they assert. FED. R. EVID. 812(c). The court admits them for the limited purpose of demonstrating the parties' knowledge and notice of the practice session dates.

[19]     The City's communications with Ms. Res (as well as its questioning at the August 2017 trial) inconsistently referred to the October 2014 opportunity as a *testing* opportunity. (*See* Tr. 502:13–15, 502:24–503:7 ("Q. Ms. Res, you didn't inform anyone that you wouldn't attend a

City and never scheduled a practice session or re-test date. She was never called for processing in subsequent paramedic training classes. (Tr. 483:19–484:8 (Res).)

Ms. Ernst did attend processing; she got her medical release, attended the practice session, and passed the Avesta test. (Tr. 266:2–8 (Ernst); Tr. 715:11–17 (Hammond); Ex. D71.) When the fire department called her to schedule her medical test, however, she "explained to them that [she] had torn a leg muscle while working at Lollapalooza" for her current employer. (Tr. 268:11–13 (Ernst).) When she went to her medical test on August 26, she took a doctor's note diagnosing her as suffering from a right medial gastric tear. (Tr. 269:1–4, 22–24 (Ernst); Exs. J32.) She was also wearing "some sort of boot" as a result of the injury. (Tr. 720:20 (Hammond).) Ms. Ernst testified that when she presented the note, Ms. Hammond told her CFD would "contact [her] for further processing." (Tr. 270:15–17 (Ernst). *See id.* at 270:15–23 ("A. . . . And I asked specifically, should I send them a note when I was cleared? And she said, 'No, we won't need a note until we call you for further processing. We will contact you for further processing.' Q. Did that make sense to you? A. Yes. Q. Why . . . ? A. Because they would know when they were calling more people to go for medical processing.").)[20] Ms. Hammond denies having told Ms. Ernst that the City would reach out to her. (Tr. 722:14–17 (Hammond).) When Ms. Ernst was eventually cleared by her doctor in February 2015 to return to ambulance work, she did not provide that clearance letter to CFD. (Ex. J17; Tr. 272:18–25 ("Q. Did you send this letter to the fire department? A. No, I did not . . . [b]ecause I was following their instructions. Q. If the fire department had instructed you to send the letter when you received medical clearance,

_____

practice session in October of 2014? . . . A. I would not have direct communications with the fire department. . . . Q. . . . You didn't have anyone on your behalf seek rescheduling of the Avesta retest session in October of 2014? A. You're talking about a retest - - oh. . . . We keep on talking about a retest and it's tiring all of us.").)

        The court also notes that the City inconsistently respected Ms. Res' request that she only be contacted through counsel. Ms. Res testified that she both received a phone call from CFD employee Monica Porter after asking to receive communications only through counsel (Tr. 500:4–8 (Res), and she received an e-mail from CFD on October 28, 2014. (Ex. J37.)

[20]     Defendant City did not object to this testimony as hearsay.

would you have done that? A. Yes, ma'am, absolutely.").)  Ms. Ernst never took the City's medical exam and was not hired for a CFD paramedic training class.

### 3.    Plaintiffs Did Not Fail to Mitigate Damages in 2014

Plaintiffs' reactions to the 2014 offers to process do not constitute failures to mitigate.  To successfully assert the failure to mitigate affirmative defense, a defendant "must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence."  *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994).  Thus, a plaintiff "forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied."  *See Ford*, 458 U.S. at 234 (footnote omitted).  If a defendant bears its burden in proving a plaintiff's failure to mitigate, the back pay award must be reduced by the amount she would have earned had she exercised reasonable diligence.  *See* 42 U.S.C. § 2000e-5(g)(1).

Rooted in the duty to mitigate, the Supreme Court held in 1982 that an offer by a defendant-employer to an "unemployed or underemployed" claimant for the position the claimant originally sought would often toll the accrual of back pay.  *See Ford*, 458 U.S. at 233 ("[T]he *unemployed* or *underemployed* claimant's statutory obligation to minimize damages requires him to accept an unconditional offer of the job originally sought, even without retroactive seniority.") (emphasis added).  Such offers must be unconditional in order to toll back pay.[21]  *Ford*, 458 U.S.

---

[21]    Though "tolling" is typically a phrase used in when discussing statutes of limitations, the *Ford* court used the phrase to describe the effect of a rejection of reinstatement on back pay.  *See, for example*, *Ford*, 458 U.S. at 238–39 ("We find that, absent special circumstances, the simple rule that ongoing accrual of backpay liability is tolled when a Title VII claimant rejects the job he originally sought comports with Title VII's policy of making discrimination victims whole.").

at 222 (explaining that the job offer at issue was unconditional because it did "not require [plaintiff] to abandon or compromise her Title VII claim against [defendant]").[22]

A plaintiff's reasonable rejection of an offer of instatement does not constitute a failure to mitigate damages. The Seventh Circuit has held both pre- and post-*Ford* that trial courts analyzing offers of instatement "must consider the circumstances under which the offer . . . was made or rejected, including the terms of the offer and the reasons for refusal." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202–03 (7th Cir. 1989) (quoting *Claiborne v. Illinois Central R.R.*, 583 F.2d 143, 153 (5th Cir.1978), *cert. denied*, 442 U.S. 934 (1979)). *See Smith v. World Ins. Co.*, 38 F.3d 1456, 1464 (8th Cir. 1994) (treating a claimant's "reasonable rejection" of an offer of reinstatement as "a special circumstance under *Ford*"); *Lewis v. Fed. Prison Indus., Inc.*, 953 F.2d 1277, 1279 (11th Cir. 1992) (analyzing "whether [the plaintiff] reasonably rejected [the defendant's] offer of reinstatement"); *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1493 (10th Cir. 1989) (explaining that "a rejected offer of reinstatement does not end ongoing backpay liability if the claimant's rejection of the offer was reasonable given the form of the offer and the circumstances surrounding it"); *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1203 (7th Cir. 1989) (noting, in the context of the tolling of front pay, that it is only "an *unreasonable* refusal" of an offer of reinstatement which "will preclude recovery") (emphasis in original) (quoting *McNeil v. Economics Laboratory, Inc.*, 800 F.2d 111, 118 (7th Cir.1986), *overruled on other grounds by Coston v. Plitt Theatres, Inc.*, 860 F.2d 834 (7th Cir. 1988)). Ultimately, courts must consider both the nature of the employer's offer and the conditions surrounding the rejection of the offer. This

---

[22] "Special circumstances" may permit a claimant to reject a job offer without affecting her ability to receive back pay. *See Ford* U.S. at 238, 238 n.27. The *Ford* Court left the weighing of such circumstances to the "sound discretion" of the trial court, providing one illustrative example that is particularly relevant to Ms. Lahalih's circumstances: "If, for example, the claimant has been forced to move a great distance to find a replacement job, a rejection of the employer's offer might reflect the costs of relocation more than a judgment that the replacement job was superior, all things considered, to the defendant's job." *Id.* at 238 n.27.

is an objective inquiry, which "requires weighing the employee's prior experience and job skills against the terms and conditions of the offer." *Graefenhain*, 870 F.2d, at 1203.[23]

Defendant City argues that its 2014 offers to process Plaintiffs' applications constitute "*Ford* Offers," and that Plaintiffs' failure to diligently pursue jobs stemming from those offers should cut off the City's back pay liability. The court concludes, however, that the City's offers to process were conditional, and Plaintiffs reasonably rejected those offers. Thus, Plaintiffs are entitled to back pay through the date of this judgment.

The Supreme Court in *Ford* treated a job offer as unconditional if it was not conditioned upon a plaintiffs' settlement or agreement to abandon claims against the defendant. *Ford*, 458 U.S. at 222. *Accord Figgs v. Quick Fill Corp.*, 766 F.2d 901, 903 (5th Cir. 1985) ("If [ ] a claimant refuses an offer of reinstatement *not* conditioned on compromising the discrimination claim, the claimant breaches his or her statutory obligation to mitigate damages.") (emphasis in original). *Ford* involved three women who applied for, and were denied, jobs at a Ford parts warehouse in 1971. In 1974, after the women had gone to work at GM, "a single vacancy opened up at Ford," and Ford offered one of the women the position "without seniority retroactive to her 1971 application." *Ford*, 458 U.S. at 222. She declined, choosing to stay at GM, and Ford offered the position to another of the three women. She too declined. *Id.* The court held that these women's rejections of Ford's job offer tolled their back pay. *Id.* at 239. In so finding, the court faced no complex questions of what Ford was offering: Ford had offered two of the claimants the very position that they had previously applied for, and it did so despite the fact that the discriminatory conduct occurred at the pre-hiring stage, as in this case.

---

[23] Courts in other circuits have also required that offers of instatement or reinstatement be made in good faith. *See Lewis v. Fed. Prison Indus., Inc.*, 953 F.2d 1277, 1279 (11th Cir. 1992); *Giandonato*, 804 F.2d at 125; *Fiedler v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 808–09 (8th Cir.1982); *Miano v. AC&R Advert., Inc.*, 875 F. Supp. 204, 223 (S.D.N.Y. 1995) (collecting cases).

Lower courts have since explored the contours of unconditional job offers and the reasonability of their rejection, expanding upon the basic definition supplied by *Ford*. Several cases suggest that offers of instatement requiring a candidate to take antecedent steps are, in fact, conditional, and that it is reasonable for plaintiffs to reject such offers. In one such case, an assistant fire chief sued the City of Wauwatosa under the Age Discrimination in Employment Act following his forced retirement at the city's mandatory retirement age of 55. *Orzel v. City of Wauwatosa Fire Dept.*, 697 F.2d 743, 747–48 (7th Cir. 1983). Wauwatosa offered to reinstate Mr. Orzel, with the offer "expressly conditioned upon Orzel's taking and passing a physical exam arranged by the City." *Id.* at 757. Mr. Orzel "refused to comply with this condition on the advice of his attorney," and the city therefore argued that his back pay should be cut off for failure to mitigate. *Id.* The Seventh Circuit concluded that "under the circumstances," the district court correctly concluded that Mr. Orzel's rejection of "the City's conditional offer" was reasonable. *Id.* These circumstances included the fact that Mr. Orzel had taken a physical exam four months earlier "as part of a trial procedure" and "passed with flying colors;" that the city was "unwilling to back up its offer of reinstatement with a written agreement;" that "the City continued to assert that it was inclined to reterminate Orzel's employment" if "any legal decision appeared to give it the right to do so;" and that the city had already extended and then withdrawn a settlement offer. *Id.*

Other circuits have come to similar conclusions. The First Circuit held in *Hogan v. Bangor and Aroostook R. Co.*, 61 F.3d 1034, 1038 (1st Cir. 1995) that "[i]n the absence of a concrete offer of reinstatement, the period of back pay accrual does not end." In that Americans with Disabilities Act case, the defendant argued that the plaintiff had failed to mitigate damages when he "refus[ed] to take a Functional Capacity Evaluation Test ("FCE") specially designed for him" to determine if he could return to work. The court trial court disagreed, and the First Circuit affirmed:

> If [Plaintiff] Hogan had taken and passed the FCE, he still had to proceed to further tests and if he cleared those he was required to obtain a clearance from [the doctor who originally failed to clear him to work]. [Defendant's] argument fails because it was by no means clear that Hogan was to be reinstated to his job upon completion of the FCE. *Id.*

In *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1485, 1493 (10th Cir. 1989), the Tenth Circuit reversed a ruling cutting off back pay, where the defendant-employer's job offer was conditioned, in part, on the claimant "passing a polygraph test . . . show[ing] no other illegal drug use other than peyote twice a year," passing a "physical examination," and "drop[ping] his claim." *Id*. at 1485. The court explained that, because the offer was conditioned on dropping the Title VII claim, it was not an unconditional offer under *Ford*. *Id.* at 1493. The court did not fully rely on that fact alone, however. It further explained that "a rejected offer of reinstatement does not end ongoing backpay liability if the claimant's rejection of the offer was reasonable given the form of the offer and the circumstances surrounding it." *Id.* In so stating, the court cited the observation in *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 879 (11th Cir.1986), "that [an] invitation to apply for position is not unconditional offer of employment." *Toledo*, 892 F.2d at 1493 (citing *Kilgo*, 789 F.2d at 879).[24] *See also E.E.O.C. v. Manville Sales Corp.*, 27 F.3d 1089, 1097 n.7 (5th Cir. 1994) (explaining that the lower court's instruction was erroneous when the court informed the "jury that it could not award backpay for any period after [the claimant] declined to interview for a position if the jury found the position to be substantially equivalent"); *Nagarajan v. Tennessee State Univ.*, 187 F.3d 637, 1999 WL 551360, at *4 (6th Cir. 1999) (unpublished table decision) (finding that a

---

[24] The cases are not entirely uniform, but they are all highly factually-specific. The Sixth Circuit in *Morvay v. Maghielse Tool & Die Co.*, 708 F.2d 229, 232 (6th Cir. 1983) found that a defendant employer was relieved of back pay liability when it offered an employee reinstatement, conditioned upon the employee's "submitting to a psychiatric evaluation": "Based upon the facts of this case we are compelled to conclude as valid the company's offer to reinstate . . . Given [the plaintiff's] past behavior and the company's unquestionable interest in maintaining a harmonious and efficient work environment the offer was reasonable." *Id*. at 232. The *Morvay* court noted that "[n]either the acceptance of the condition nor the results of the evaluation would have altered [Plaintiff's] status or position in the company."). *Id.* That is certainly not true of the hiring conditions imposed by the City's 2014 offer here. *See also Clarke v. Frank*, 960 F.2d 1146, 1151 (2d Cir. 1992) (holding that the "district court did not err" when it found that an offer of reinstatement, qualified by "the Postal Service's standard prerequisites that Clarke pass a driver's test and a physical examination," was unconditional); *Morris v. American Nat. Can Corp.*, 952 F.2d 200, 202–03 (8th Cir. 1991), *overruled on other grounds by* 988 F.2d 50 (8th Cir. 1993) (finding that the district court did not err when it held that a job offer, qualified by a requirement that the plaintiff "transmit medical records and [ ] take a physical examination before returning to work," to be unconditional, when the plaintiff's health problems provided reasonable grounds for the employer to request a physical exam, and when a CBA required a physical examination).

university's offer of an opportunity for a candidate to re-apply for tenure was "not an 'unconditional offer' for purposes of mitigation of damages").

With these cases as guidance, the court concludes that the City's 2014 invitation to process was not an unconditional job offer, and that Plaintiffs reasonably rejected the offer outright (as in the case of Ms. Lahalih and Ms. Kean), or that their respective failures to complete processing were reasonable (as in the case of Ms. Hoard, Ms. Res, and Ms. Ernst). First, the court does not find the City's offer to be an offer of employment, as required by *Ford*. The 2014 offers to process, by their own terms, were not job offers. (Ex. J33 ("**THIS IS NOT AN OFFER OR GUARANTEE OF EMPLOYMENT**") (emphasis in original).) *Cf. Ford*, 458 U.S. at 234 ("[T]he unemployed or underemployed claimant's statutory obligation to minimize damages requires him to accept an unconditional *offer of the job originally sought*.") (emphasis added). The Plaintiffs here sought paramedic jobs—they were offered only opportunities to re-process for a job. *See also Easterling v. Connecticut Dep't of Correction*, No. 3:08-CV-826 (JCH), 2012 WL 13027455, at *5 (D. Conn. June 27, 2012) (noting, in dicta, that the court did not consider it to be "a reasonable assertion" "that an offer to retake a test could fairly be analogized to an offer of instatement").

Further, the City's offer to process was conditional. To secure even a "conditional offer of employment," a Plaintiff was required to pass the Avesta physical skills test, a background check, a drug test, and a stress test. (Ex. D89 (explaining to candidates after they pass the Avesta test: "If you fail to meet any of the required standards, . . . this <u>conditional</u> offer of employment shall be revoked.") (emphasis in original).) If she completed each of these steps, the Plaintiff would still have to wait for "the availability of an open position in a training class at the Chicago Fire Academy" before she could actually be employed by CFD. (Ex. D89.) *Cf. Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 879 (11th Cir. 1986) (finding that an offer was not unconditional when it invited a claimant "'to submit an application' for one of an undisclosed 'number of vacancies'"). The court finds such an offer to be more like the offers in *Orzel*, *Kilgo*, and *Manville*, where pre-

requisites and requirements that claimants re-apply were insufficient to toll backpay under *Ford*. Unlike *Morvay*, the prerequisites imposed by the City here directly controlled Plaintiffs' ability to obtain employment.

The court understands that paramedics hold important positions affecting public safety. (City's Post-trial Brief [743], at 7.) Yet the City itself recognized that the women were capable hires when it stipulated that "but for discrimination each Plaintiff would have been hired" in 2005. (Proposed Scheduling Order [676], at 2.) It is possible that, ten years later, each Plaintiff's capabilities may have changed. In spite of that possibility, the City has objected to an award of front pay, arguing that the women should be instated. There is no evidence in the record that CFD paramedics are expected to undergo skills or physical fitness testing to ensure their continued ability to pass the entrance exam, and Title VII's "remedial purpose . . . is to place the victim 'where they would have been were it not for the unlawful discrimination.'" *Hicks v. Forest Pres. Dist. of Cook Cty., Ill.*, 677 F.3d 781, 792 (7th Cir. 2012) (citing *Hutchison v. Amateur Electronic Supply, Inc.*, 42 F.3d 1037, 1045 (7th Cir.1994)). Having *stipulated* that the women would have been hired, the City bears the burden of proving that its offers were unconditional, and it has not met that burden here. *See Hogan v. Bangor & Aroostook R. Co.*, 61 F.3d 1034, 1038 (1st Cir. 1995) ("In the absence of a concrete offer of reinstatement, the period of back pay accrual does not end.").

Finally, the Plaintiffs' reactions to the City's offers to process were reasonable. The women had been in litigation with the City for six years, yet they had never been offered to process for any prior paramedic classes. The City had recently issued, and then withdrawn, subpoenas to the women's employers, seeking extensive background information. (Plaintiffs Motion to Quash Subpoenas [318], at Ex. 2.) The City's communications with the women regarding the offers to process emphatically explained that they were not being offered jobs, despite the stipulation that they would have been hired back in 2005, and the parties were engaged in

contested litigation, in which two trial dates had already been set and postponed.[25]  *See Orzel*, 697 F.2d at 757 (where a settlement had been extended and then withdrawn by the Wauwatosa). Finally, the Plaintiffs were aware that the CFD had been sued by other plaintiffs for discrimination. (Tr. 329:1–3 (Ernst) (demonstrating an awareness of another lawsuit discrimination against the CFD).)  *Nagarajan*, 187 F.3d at *4 (considering evidence of discrimination against other faculty members in assessing the reasonability of the plaintiff's rejection of an offer to re-apply for a tenure promotion).  On these grounds, the court finds that it was reasonable for the Plaintiffs to reject the City's offers to process.  The fact that Ms. Hoard, Ms. Res, and Ms. Ernst did make efforts, ultimately unsuccessful, to pursue the position in 2014 does not alter that finding.[26]

### C.    The City's 2017-2018 Invitations to Process

---

[25]    See docket entries [223], [251], [300], and [386] setting and vacating trial dates. The women also discussed their responses to the offers to process with their lawyers.  (*See, for example*, Tr. 186:11–13 (Kean)).  *See Orzel*, 697 F.2d at 757 (considering Mr. Orzel's reliance on the advice of his attorney in analyzing the reasonability of Mr. Orzel's rejection of an offer of reinstatement).  The court recognizes that, notwithstanding any communications with counsel, three of the women decided to attend the processing anyway.  The contents of attorney-client communications are privileged, and the court will not hold any individual Plaintiff to be prejudiced by another Plaintiff's actions or individual attorney-client communications.

[26]    The City has not shown that Plaintiffs' reactions to the processing were unreasonable.  Ms. Hoard's failure to bring her medical release to the practice session was reasonable, given that CFD never instructed women at the initial processing meeting that there would even be a practice session (Tr. 726:25–727:11 (Hammond)), and given that she had already made her doctor's appointment for a date after the practice session when she was notified about the session.  (Tr. 213:20–22 (Hoard).)
   Ms. Res's failure to respond to the City's October 2014 mandatory practice session was also reasonable.  She had clearly communicated to the City that all communications should go through her attorneys (Ex. D95), and the past practice session had not been mandatory.  The court finds that her testimony that she read the first part of the e-mail credible (Ex. J37 ("You must report to the Chicago Fire Paramedic physical ability practice session")), and her decision that she did not need to go to a practice session is reasonable under the circumstances.  (Tr. 481:16–18, 492:21–25 (Res).)
   Ms. Ernst's understanding that CFD would contact her for a follow-up stress test appointment is also reasonable and does not constitute an offer rejection under *Ford*.  She had applied for every single hiring list posted by CFD since 2004.  The City has not proven to the court that Ms. Ernst would made it all the way through to the stress test portion of paramedic processing, after 10 years of trying to get to that point, and then "simply chose not to show up and participate." (City's Post-trial Brief [743], at 19.)

Following Plaintiffs' responses to the 2014 offers to process, the City made no additional offers to Plaintiffs until 2018.

At the August 2017 damages trial, Chief Vasquez testified that he had recommended an academy class of paramedics for early 2018. (Tr. 683:24 (Vasquez).) That class would be formed to fill an expected 25 paramedic vacancies, and five of those 25 training positions were to be reserved for Plaintiffs. (Tr. 685:5–7 (Vasquez); Tr. 741:24–742:1 (Porter) ("Q. There would still be a need [for a 25-person class] even if the city wasn't being sued by these five plaintiffs, right? A. Correct.").) The idea to reserve seats for Plaintiffs arose on the eve of the August 2017 damages trial, and the City explicitly intended for the invitation to cut off any front pay stemming from this litigation. (*See* Tr. 699:699:6–10 (Vasquez) ("Q. . . . [W]hat is it that caused [Plaintiffs] to be brought into the conversation [about department hiring needs]? A. The potential to cut off front pay. Q. This lawsuit? A. Absolutely."); 704:5–8 (Vasquez) ("Q. Can you point me to any conversation you had about a formation of a class of 25 for the first quarter of 2018 before the last week or so? A. I can't recall. I could say for sure, yes, last week.").)

Defense counsel's direct questioning of Chief Vasquez at trial suggested that Plaintiffs would have been invited to process for the class regardless of this court's ruling, but there is no properly admitted evidence on the record regarding this issue. (Tr. 686:14–48 (Vasquez) ("Q. [ ] This idea of reserving slots for plaintiffs, without a settlement or judgment, is there precedent for that with the fire department in the paramedic area? A. I don't recall on the paramedic side, but on the firefighter side, I believe, yes.").) Finally, in April 2018, Plaintiffs sought leave to submit evidence that the City had failed to instate Plaintiffs in the Spring 2018 paramedic class. (Plaintiffs' Motion for Leave to File Evidence of Defendants Failure to Make Offers of Instatement to the March 19, 2018 Paramedic Academy [761]). The court granted the motion ([764]), admitting

a sworn declaration from one of Plaintiffs' attorneys that another of her clients had been placed in the March 19, 2018 training class. (Declaration of Marni Willenson [761-1], at ¶ 3.)[27]

On May 2, 2018, a few weeks after the Court allowed Plaintiffs to proffer this evidence, the City wrote each Plaintiff a letter. The letters read: "As the City of Chicago offered you in April 2014, the City of Chicago hereby again offers you a guaranteed position in the next Chicago Fire Department [ ] paramedic academy class. This class is anticipated to start in 2019, and no later than April 30, 2019." (City of Chicago's Supplemental Response, Ex. A-1 [766-2].) The letter continued by explaining that the offer is "made unconditionally, without any compromise to your litigation and/or claims . . . [but that] the offer of employment with the City is subject to your successful completion of all the standard pre-hire prerequisites that apply to all CFD paramedic applicants." (*Id.*) The letter finally requested that Plaintiffs "accept or reject this offer within sixty days of the date of this letter." (*Id.*).

For reasons discussed above, the court concludes that this offer, too, is conditional, and that Plaintiffs acted reasonably in rejecting it under the circumstances. First, the May 2018 offer is disingenuous: in 2014, as discussed above, the City did not offer Plaintiffs "a guaranteed position" in the academy class. (Tr. 622:25 (Bryant) ("It's an invitation to process.").) To state so here is misleading. The requirement that Plaintiffs respond within 60 days is also troubling. The letters referenced a future class, guaranteed "no later than April 30, 2019," but requested that Plaintiffs commit to the process at least ten months in advance, with this court's ruling still pending.

---

[27]     Defendants argue that this declaration constitutes hearsay and is irrelevant. The court concludes that the evidence is, in fact, relevant to clarify the City's pending offer to reinstate Plaintiffs, and that it has substantial guarantees of trustworthiness such that it falls under the residual exception to the hearsay rule. FED. R. EVID. 807 ("[A] hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804: (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice."). The court notes, as well, the obvious: that if Attorney Willenson's information is inaccurate, the City itself is in the best position to rebut it.

The Plaintiffs had already reasonably understood that they would have a place in a March 2018 class, which the City then failed to formally offer them, and they could have reasonably mistrusted the City's representations regarding a 2019 class as well. Further, Plaintiffs had already heard trial testimony about the complicated formation of paramedic training classes: about the annual budget requirements for paramedic classes (Tr. 680:21 (Vasquez)), how multiple officials and offices are involved in forming a paramedic academy class (Tr:679:21–680:20 (Vasquez)), and that the fire commissioner and the mayor can terminate an academy class before completion. (Tr. 686:4–6 (Vasquez).) Thus, these May 2018 offers to process, and Plaintiffs' rejection of them,[28] will not toll back pay.[29]

## II.    Elements of Back Pay

Because the court finds that back pay was never tolled, it turns to the proper elements to be considered in calculating backpay through the date of judgment. While the parties agree on certain elements of the back pay calculation, they disagree on several critical points.

Plaintiffs calculate a total back pay award of $4,868,000.[30] (Rebuttal Report Table 1 Schedule S [Ex. P151].) This number is calculated by Plaintiffs' expert witness, Mr. LoGiudice, from Plaintiffs' claimed lost earnings, lost pension contributions, pre-judgment interest, tax gross-ups,[31] and Plaintiffs' claimed interim earnings. (*Id. See generally* Ex. P115, P116.) The City

---

[28]    The Plaintiffs responded to the City's May 2018 offer on July 2, 2018, stating that the May 2, 2018 "communication was not an offer." (City of Chicago's Status Report Regarding Additional Offers of Instatement [768], at Ex. J.)

[29]    Given this finding, the court need not discuss the May 2018 offer to Ms. Res. (City of Chicago's Status Report Regarding Additional Offers of Instatement [768], at 3.) Had she received it, she could have reasonably rejected the City's new offer to process.

[30]    This number aggregates the back pay awards that Mr. LoGiudice calculated for each individual Plaintiff. Individually, this calculation breaks down as follows: $812,325 for Ms. Ernst, $1,224,930 for Ms. Hoard, $654,263 for Ms. Kean, $946,194 for Ms. Lahalih, and $1,230,287 for Ms. Res. (Ex. P151.)

[31]    A tax gross-up accounts for the tax implications of receiving multiple years of back pay in one lump sum. The Seventh Circuit explained the concept in a recent Title VII back pay case:

argues that this damages calculation is incorrect because it does not account for attrition and wrongly includes pay increases for promotions and tax gross-ups. In total, Defendant calculates a total backpay liability of approximately $2,472,891.[32] (Ex. D163; Tr. 669:10–14 (Breshears) (Q: . . . And getting to the bottom line in the aggregate amount, your aggregate amount applying all of those assumptions, discounts, rates, and calculations is $2.4 million and some change? A: That's correct.).)

## A. Promotions in Rank

### 1. Paramedic-in-Charge

New firefighter paramedics begin at the F1 pay grade, pursuant to the collective bargaining agreement ("CBA") between the City and the Chicago Fire Fighters Union, Local No. 2.[33] Promotion opportunities within CFD allow paramedics to move up that pay scale. The first is a promotion to the F3A grade of paramedic-in-charge[34] ("PIC"). While paramedics are "responsible for cleaning and restocking the ambulance, [and] driving the ambulance to and from emergency scenes," a PIC is a supervising paramedic "responsible for generating patient care reports and

---

Upon [the Plaintiff's] receipt of the $43,300.50 in back pay, taxable as wages in the year received, [Plaintiff] will be bumped into a higher tax bracket. The resulting tax increase, which would not have occurred had he received the pay on a regular, scheduled basis, will then decrease the sum total he should have received had he not been unlawfully terminated by [the Defendant]. Put simply, without the tax-component award, he will not be made whole, a result that offends Title VII's remedial scheme.

*E.E.O.C. v. N. Star Hosp., Inc.*, 777 F.3d 898, 904 (7th Cir. 2015).

[32] The court understands that the City's expert may make some adjustments in his final calculations. (Tr. 674:9–14 (Breshears) (discussing a $21,000 adjustment in Plaintiffs' favor based on a changed calculation of interest).)

[33] Three CBA's have been in place over the course of this litigation. (Ex. J13 (2003 CBA), J15 (2007 CBA), J20 (2012 CBA).)

[34] PIC's receive the F3A pay grade. (Pls.' Post-Hearing Proposed Findings and Conclusions [734], at 11; Ex. J13 at ERN000127; Ex. J20 at ERN019068.)

any recordkeeping . . . for communications with the Officer of Emergency Management . . . [and] for insuring [sic] the patient well-being during patient transport." (Tr. 538:5–19 (Porter). *See* Ex. P148 (describing PIC job duties).)[35]

From 2005 through 2013, PIC promotions were made on a "first-come, first-served basis." (City of Chicago's Proposed Findings of Fact and Conclusions of Law ("City's Proposed Findings") [736], at 3.) After a paramedic finished her nine-month probationary period, she was entitled to put her name on the PIC promotion list, and after eighteen months, she would be eligible to receive that promotion.[36] This promotion required no additional test and no interview—it was purely based on the list.

Defendant City argues that not all paramedics apply for PIC promotions as soon as they are eligible. (*See* Tr. 561:19–565:20 (CFD Ambulance Commander Mark Kiely) (explaining that he did not apply for a PIC position for several years, even though he was eligible, for reasons including that he did not want to be paired with a new partner, to be barred from driving the ambulance, to be assigned to a new firehouse, and or to take on more responsibility.) The burden of proof is on the Defendant, however, and no Plaintiff testified that any such factors have influenced their current or past jobs and promotions.[37] Instead, each woman testified credibly that she would have applied as soon as she was eligible for the PIC promotion, (Tr. 121:22–24 (Lahalih); 160:15–161:9 (Kean); 220:18–23 (Hoard); 252:21–253:4 (Ernst); 462:6–463:15 (Res)), and each woman's past promotion-seeking and working of multiple jobs corroborates this testimony.

---

[35] For further description of the difference between paramedic and PIC job duties, see Tr. 559:24–560:24 (Kieley).

[36] Ms. Porter, Commander in the Bureau of Administrative Services, explains that "there was a rolling list . . . that remained open indefinitely. So there was always an opportunity for an employee who met their . . . nine-month probationary period . . . to sign up" for the PIC promotion. (Tr. 539:22–540:3 (Porter).)

[37] Ms. Lahalih moved to Philadelphia seeking new opportunities, but she did not testify to making geography-, responsibility-, or partner-based decisions once in Philadelphia.

The parties debate the date on which Plaintiffs would have been promoted to PIC. Plaintiffs contend that backpay for a PIC position should be calculated from September 1, 2008. (Tr. 360:16–18, 364:24–365:1 (LoGiudice).)  They provide data stating that, of the 80-person[38] comparator cohort hired between January 1, 2005 and July 1, 2005, 36 received promotions to PIC.  (Ex. P138; Tr. 367:11–17 (LoGiudice).)  Those 36 individuals received the PIC promotion an average of 21 months after they applied for the PIC position, and the Plaintiffs asked their expert to add ten months to that average and assume that Plaintiffs would have been hired as PIC's 31 months after applying for the promotion.  (Tr. 367:13–368:10 (LoGiudice).)

"Once a plaintiff has established the amount of damages she claims resulted from her employer's conduct, the burden of going forward shifts to the defendant to show that . . . damages were in fact less than the plaintiff asserts."  *Hutchison v. Amateur Elec. Supply, Inc*., 42 F.3d 1037, 1044 (7th Cir. 1994).  Defendant argues that Plaintiffs' calculation is flawed, given that, as of September 2008, only 22 of the 79 cohort paramedics had received a promotion to the PIC level.  (Ex. D42, at 2.)  The City instead claims that back pay damages should not include the PIC promotion salary until November 2011—this is "the date at which the majority of [ ] CFD Paramedics hired between January 1, 2005 and July 1, 2005 . . . were promoted to the rank of Paramedic-in-Charge."  (City's Proposed Findings [736], at 4 ¶ 17; Ex. D42, at 2.)  As defense expert Mr. Breshears explains, he wanted "to see what would happen to a typical paramedic working in this cohort of individuals," (Tr. 648:15–16), and November 2011 marks the point where "a typical individual is more likely to be a paramedic in charge."  (Tr. 649:8–9 (Breshears).)  Mr. Breshears notes that, in November 2009, "there were 18 Paramedics in Charge and only 17

---

[38]     Defendants contend that this cohort contains only 79 people.  (Tr. 645:23 (Breshears); Ex. D42, at 5 n.6.)  Defense expert explains that the 80th member of the cohort (Janet Ortega) "was hired on December 16, 2005" (Ex. D42, at 5 n.6), but had "pay records prior to that that may have been zeroed out or voided." (Tr. 646:1–3 (Breshears).) Both experts testified that the use of a 79 or 80 person would not make a "significant difference."  (Tr. 646:8 (Breshears); Tr. 347:11–12 (LoGiudice) ("Q. Does that make a material difference? A. Not in my mind.").) Plaintiffs provide no additional explanation for why the 80th person should be considered with the rest of the cohort.  The court finds that the cohort contains 79 people.

Paramedics," meeting his standard for determining when Plaintiffs should begin to receive backpay for the PIC promotion.[39]  (Ex. D42, at 6 n.10.)  In the next pay period, however, he notes that the numbers reverse and there are again more paramedics than PIC's "until November 2011. After November 2011, the number of Paramedics in Charge was always more than the number of Paramedics."  (*Id.*)  At that date, "there were 14 Paramedics in Charge and 11 Paramedics." (*Id.* (footnote omitted).)[40]

Again, the court concludes that Plaintiffs' calculation is more appropriate.  In the circumstances of this case, each Plaintiff has demonstrated her work ethic and drive.  Each has held steady employment in a position requiring a paramedic license for more than a decade, and each has worked at least one secondary job in addition to her primary employment at some point in her paramedic career.  Every Plaintiff except Ms. Kean has applied for at least one promotion, and the court credits Ms. Kean's unrebutted testimony that promotions are not available to paramedics with her employer.  Further, the barriers to applying to become a PIC are low.  (Tr. 567:12–15 (Kiely) ("The Court: So the Paramedic in Charge promotion is not as competitive?  The Witness: Correct.  There is no test.  There is no written - - it's just I'm ready. I want to do it.").)  In order to become PIC's each woman would have simply needed to place her name on a list.

Defendant City's PIC promotion calculation depends on the court discrediting this testimony, and, instead, assuming that, like at least some of their colleagues, Plaintiffs would have delayed in applying for PIC.  (See Ex. P138.)  The City bears the burden of disproving Plaintiffs' calculation, and there is no evidence that these Plaintiffs would not have immediately applied for the PIC job.  The City further fails to provide clear data showing the average time it took cohort paramedics to *apply* for a PIC promotion.  The only remaining question is how long it

---

[39]     The court understands that the cohort size had dropped due to a combination of employees crossing over to become paramedic firefighters, termination, resignation, and death. (Ex. D42, at 7; Ex. D114.)

[40]     Again, the cohort size dropped for the reasons discussed in note 38 above.

would have taken Plaintiffs to become PIC's once they applied. Because Plaintiff's model calculates the average time among the cohort's PIC applicants, and the Defendant's model simply calculates the average time for the shrinking cohort to have more PIC's than paramedics, the court finds that each Plaintiff would have been promoted to PIC F3A positions on September 1, 2008.

## 2. Ambulance Commander

After achieving the position of PIC, the next promotion available to Plaintiffs would be that of Ambulance Commander ("AC"). AC is a supervisory position, and an AC's responsibilities include ambulance maintenance, "identifying inventory, vacancies, and placing the monthly supply order," maintaining employee files, and "cataloguing and maintaining orders and directives . . . for employee reference." (Tr. 546:22–547:8 (Porter).) There is just one "Ambulance Commander for each Ambulance Company" within the CFD. (Ex. J20, at ERN019068.) Thus, a promotion to Ambulance Commander (pay grade F5) is more selective and more difficult to achieve than the PIC promotion.

To become an AC, a candidate must have been a PIC for thirty months and apply and test for the AC opportunity. (Tr. 546:21 (Porter); Ex. J20, at ERN019068.) The test has three components: seniority,[41] an oral exam, and a written exam. (Tr. 270:6–16 (LoGiudice); Tr. 546:22–547:12 (Porter).) These components respectively count for 30, 35, and 35 percent of a candidate's aggregate score, and that score places candidates on an AC promotions list, where candidates with the top scores are promoted first.[42] (Tr. 370:11–16 (LoGiudice); Ex. P116, at 9.)

---

[41]    Plaintiff's expert testified that a candidate can receive up to a maximum of 144 months of seniority credit toward the AC promotion, with 144 months representing 12 years or more of service with CFD. (Tr. 270:8–10 (LoGiudice).) Commander Monica Porter of the CFD Bureau of Administrative Services testified that a full "12 years of service" gives a candidate "the full seniority mark of 30 points." (Tr. 547:23–25 (Porter).) The court assumes that the 144 months are thus scaled to represent thirty percent of the candidate's overall score. Regardless, the two witnesses agree that 12 years of service is required to receive full credit for seniority.

[42]    The overall score needed to pass is not clear from the record, but the final 2012 AC test scores reflect a high score of 94.238 and a low score of 23.2931. (Ex. J3.) The 2016 AC

The weight of the seniority component and the length of time between opportunities to apply for an AC promotion means that it can take years to achieve the promotion. (*See* Ex. J20, at ERN019068 ("Promotions to the position of Ambulance Commander shall be made to employees in the position of P.I.C, on the basis of seniority."; *id.* ("No [AC] list shall be used for more than eight (8) years.").)

CFD administered AC exams in 2007,[43] 2012, and 2017.[44] (Exs. J3, J5, J24; Tr. 375:19–21, 379:2–4 (LoGiudice) (testifying that CFD gave AC exams in 2012 and early 2017).) Plaintiffs argue that they should be awarded a small amount of back pay based on the small probability that they would have been promoted to AC as a result of the 2012 test. Four of the Plaintiffs testified that they would have applied for the promotion and would have taken the first exam for which they were eligible—the 2012 exam. (Tr. 122:7–13 (Lahalih); 161:19–162:8 (Kean); 221:4 (Hoard); 464:21–25 (Res).). Ms. Ernst testified that she would have applied for an AC job "at or around [her] ten-year mark of seniority on the job" in order to "spend some time being a PIC and spend some time on the job and, for lack of a better way to put it . . . paying your dues." (Tr. 256:17–22 (Ernst).) Thus, Ms. Ernst would have taken the 2017 exam, as would her fellow Plaintiffs, had they not been promoted from the 2012 list. (*See* Tr. 161:23–162:2 (Kean).)

Calculating the back pay attributable to a potential AC promotion is not as simple as the PIC calculation. As noted, Plaintiffs first would have needed to pass a comprehensive test, and there are fewer AC positions than PIC positions. The City argues, on this basis, that an award of

---

test scores (released after trial) reflect a high score of 98.1299 and a low score of 45.6617. (Ex. 165.)

[43] Commander Porter testified that she sat for the AC exam in 2006. (Tr. 547:22 (Porter) (explaining that she "sat for the exam in 2006 and 2012").) However, the exhibit providing test scores suggests that the test took place in 2007. (Ex. J5.)

[44] At the time of the damages trial, the results of the 2017 test had not been released. Those results were released after trial and admitted into evidence as Exhibit 165. (Minute Entry [753] (granting Plaintiff's motion to file supplemental exhibit [749].) The parties interchangeably call the 2016 exam, for which results were released in 2017, the 2016 or 2017 exam. The court will refer to it as the 2017 exam for consistency. (*See* Ex. 165.)

such back pay would be speculative. This, by itself, does not preclude some award for this lost chance; "measuring backpay always involves some level of speculation." *Geraty v. Vill. of Antioch*, No. 09 C 6992, 2014 WL 1475574, at *2 (N.D. Ill. Apr. 15, 2014). A more troubling issue is that no member of Plaintiffs' comparator cohort had achieved the AC rank as of 2017. (Tr. 652:16 (Breshears) (explaining that Defendant's counsel "informed [him] that none of the 79 individuals in the cohort had achieved the rank of ambulance commander as of 2017"); Ex. D114 (Summary of Cohort Data); Ex. J6 (City Comptroller Payroll Data).) Plaintiffs' expert did not address this issue because instead of calculating 2012 promotion probability based on the comparator cohort from 2005, he based his calculations on the entire group of applicants who took the exam, regardless of when they first became paramedics. (Tr. 434:17–20 (LoGiudice).) Mr. LoGiudice looked at all 154[45] employees who sat for that exam. Of the 154 candidates who tested for the AC promotion in 2012, 69 received the promotion by the end of 2016; of those 69, 41 had received maximum seniority credit. (Ex. P116, at 10.) Promotions were "highly weighted to people who have more seniority." (Tr. 372:3–4 (LoGiudice).) The five Plaintiffs in this case would have had only 86 months of seniority as of 2012 and would have fallen into a percentile of 28 applicants, with 84 to 117 months of experience, of whom only 4 received AC promotions. (Ex. P116, at 10.)

Plaintiffs' expert did account for the possibility that Plaintiffs might not have passed the test. He did so by reducing the back pay award on the basis of the average pass rate for the 2012 exam. (Tr. 373:1–16; Tr. 377:3–378:4 (LoGiudice).) He also accounted for the fact that each AC promotion list is used for several years before being retired. There were five rounds of

---

[45] Defense expert Mr. Breshears notes, "No evidence exchanged by the parties appears to indicate the total number of Paramedics in Charge . . . who took the test and successfully completed the oral examination. Without such supporting evidence, it is speculative to say that there is a 100% probability that the Plaintiffs would have attempted to be promoted or done well enough on the written and oral examination to achieve promotion." The court notes that this evidence would have been under the exclusive control of the Defendant, and the court will not penalize Plaintiffs for data that Defendants failed to provide to their own expert.

promotions to AC based off the 2012 test; these took place 71, 86, 344, 451, and 983 days after the test. (*See* Ex. P116 (LoGiudice), at 10; Tr. 375:2–376:11 (explaining how Mr. LoGiudice calculated "promotional value in the back pay period" for the likelihood of Plaintiffs' promotions at each round of promotions that occurred at 71, 86, 344, 451, and 983 days after the 2012 test was given).) As a result, Plaintiffs' expert calculated a probability of promotion on the basis of average test scores, seniority, and promotion timeline. (*See* Ex. P116, at 11 Table 2.) His calculations suggest that Plaintiffs had a 14.29 percent chance of being promoted to AC if they took the 2012 AC test, and he accounted for this in his backpay calculation. (*Id.*)

The court finds Mr. LoGiudice's *methods* consistent with this Circuit's "loss of a chance" method for "handl[ing] probabilistic injuries." *See Biondo v. City of Chicago*, 382 F.3d 680, 688 (7th Cir. 2004).[46] In the court's view, however, these calculations should have been performed based on the comparator cohort, and not based on the entire pool of AC applicants, just as the comparator cohort was used for the PIC calculation. Plaintiff provides no justification for changing the comparator group solely for the AC back pay calculation.

Regarding back pay for the loss of a chance from the 2017 AC exam, the results of that exam are now available to both parties. (Ex. P165.) Back pay for this subsequent exam should be calculated from the date the results were released through the date of judgment.

---

[46]    Disappointingly, the City does not provide any calculation for the AC promotion. (Ex. D42, at 2 ("[A]s requested by Counsel, I have assumed that none of the Plaintiffs would have been promoted to Ambulance Commander.").) Instead, the City stands by its position that Plaintiffs simply would not have received the AC promotion: "[t]he Ambulance Commander promotion is a competitive promotion, and Plaintiffs have presented no credible evidence that they would have obtained that promotion (particularly when none of the members of their Cohort had)." (City's Post-trial Brief [743], at 26.) The City is reminded, however, that it bears the burden to disprove the Plaintiffs' established damages.

## B. Attrition

Defendant City argues that Plaintiffs' back pay calculation should be reduced by the rate of attrition among Plaintiffs' comparator cohort.[47]  (Ex. D42, at 5–6.)  All Plaintiffs credibly testified that they would have stayed at CFD through the time their pension vested, however, twenty years from their start date.  (Tr. 122:18 (Lahalih); 170:9–11 (Kean); 221:8–13 (Hoard); 273:24–274:5 (Ernst); 454:24–455:1 (Res); 484:21–25 (Res).)  Thus, it becomes the Defendant's burden to prove that any Plaintiff would have separated from CFD before then.

The City provides evidence that, by the end of 2016, 17 of the original 79 cohort members had been terminated, resigned, passed away, or were placed on extended leave.  (Ex. D42, at 8 (Table).)  The City's expert, Mr. Breshears, did not consider whether a paramedic's separation from CFD was "voluntary or involuntary."  (Ex. D42, at 5, 8; Tr. 660:11–12 (Breshears)).  The City argues that such information is irrelevant: if Plaintiffs want to be awarded pay for their cohort's "promotions earned, overtime worked, and raises awarded," the City argues, Plaintiffs should also have to take a reduction in back pay for the general rate of paramedic attrition.  (City's Post-trial Brief [743], at 22–23 ("Plaintiffs and their expert used [ ] statistical analysis only when it served to enlarge their damages and rejected the statistical analysis when it lessened their damages.").)

To support this argument, the City cites class action case law.  For example, *Lewis et al. v. City of Chicago*, No. 98-cv-5596, Injunctive Order of Relief ECF No. 405, at 4–5 (N.D. Ill. Apr. 19, 2007) involved a class of African American fire fighter-applicants who sued the City of Chicago for discrimination.  The court ordered "the number of class members for whom backpay is computed [to] be reduced by" yearly attrition rates.  *Id.*  That order, which the court subsequently vacated, s*ee* No. 98-cv-5596, Minute Entry ECF No. 448 (N.D. Ill. Oct. 9, 2008) (vacating ECF

---

[47]     The City argues that "[t]his practice makes particular sense in the instant case, where *Plaintiffs' entire damages model relies on envisioning a twenty-year career that did not actually occur*."  (City's Post-trial Brief [743], at 22 (emphasis added).)  The City is reminded that the Seventh Circuit held that Plaintiffs' careers "did not actually occur" due to the City's illegally discriminatory physical skills test, *Ernst*, 837 F.3d 788, 805, and that the City has stipulated that, but for that test, Plaintiffs would have been hired.  (Proposed Scheduling Order [676], at 2.)

No. 405), addressed aggregated class-wide back pay and not individualized back pay. The court there had no other way to ascertain how yet-unidentified class members would have behaved had they been hired.[48]  *See* No. 98-cv-5596, Injunctive Order of Relief ECF No. 405, at 2. Apparently acknowledging that class action cases are distinguishable, the City characterizes these Plaintiffs as a "purported 'class'."  (City's Post-tiral Brief [743], at 24 ("While the application of an attrition rate typically occurs in the context of a class action setting, the application is particularly appropriate in this case where Plaintiffs seek out the benefits of their purported 'class,' but reject any the potential financial drawbacks.").)

This is simply incorrect.  Unlike *Lewis* and the other class action cases cited by the City, the court here has the benefit of knowing each Plaintiff's detailed work history, as well as the reasons for which each of the 17 "attrited" paramedics left CFD.  *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1371 n.8 (S.D. Fla. 1998) ("While statistical evidence has long been admissible in Title VII actions, it must be weighed against credible evidence which distinguishes an individual claimant.") (internal citation omitted).  Thus, the court finds it appropriate to perform an individualized inquiry regarding whether each Plaintiff would have left CFD.

---

[48]     Defendants also cite other class actions.  In *United States v. City of New York*, 847 F. Supp. 2d 395, 417, 426 (E.D.N.Y. 2012), the district court considered attrition rates when calculating the plaintiff class's pre-mitigation "total aggregate amount of gross wage losses." There, both sides agreed that an attrition rate applied and debated only what the attrition rate should be.  *Id.* at 426.  *See also Pegues v. Miss. State Employment Serv.*, No. DC72-4-LS-D, 1988 WL 72795, at *12–*13 (N.D. Miss. Feb. 11, 1988) (taking attrition into account when calculating "the economic benefit which would have resulted from each job order involved in back pay proceedings" by agreement of the parties, and finding that "[t]he estimated earnings specified in the job order descriptions . . . do not represent the amount of back pay due class members."); *Sledge v. J.P. Stevens & Co.*, No. CIV. 1201, 1989 WL 90562, at *9 (E.D.N.C. Feb. 23, 1989) (adopting the plaintiffs' attrition calculations, where the parties in the class action "agree[d] that there was a constant turnover of employees at defendant's plants" and the only debate was how to calculate attrition).  The City provides no non-class action case law using attrition to decrease individual plaintiffs' Title VII back pay awards.

First, the court notes the reasons for attrition among cohort members: 5 quit during the paramedic training academy, 2 were "cross-overs" (that is, paramedics who have also become firefighters), 2 were on leave, 2 "resigned from LOA,"[49] 3 were "discharged," 1 left to "return to school," 1 left for "other employment," and 1 is listed as "cross-over; died."  (Ex. P141 ("Reasons for Separations from EMS Employment") (citing City's Response to Requests for Admission).) *Compare* Ex. D42, at 8 (Breshears Table) (designating each of the 17 employees as terminated, deceased, resigned, or on extended leave.)  Mr. Breshears' expert reports explained that his calculation did not include "employees who were hired into other positions with CFD," (Ex. D42, at 6), so it is not clear why 3 cross-over employees were included as having attrited.

Regardless, there is no evidence that any of the Plaintiffs in this case would have left CFD for any of the above-noted reasons.  None expressed interest in any firefighter work, and so would not have crossed over.   Defendants do not define "leave of absence," and without more information, the court cannot find that any of the women would have taken a leave of absence, nor resigned from a leave of absence.  Ms. Kean had knee surgery in the late 2000's, but there is no evidence she took any leave of absence.  (Tr. 175:23–176:13 (Kean).)  Ms. Lahalih took FMLA leave following the birth of a child.  (Tr. 113:3 (Lahalih).)  Again, there is no evidence from the City that such a circumstance would constitute "leave," and it certainly does not suggest any permanent "attrition" from CFD.  Additionally, no Plaintiff has gone back to school or sought out a new career, with the exception of Ms. Lahalih who worked interim jobs at Starbucks and IKEA after moving, and before finding a new paramedic job.  Finally, no evidence suggests that any Plaintiff has been discharged from any job she has held since 2005, nor that there has been any reason for a discharge.

The City argues that "[e]ven under Plaintiffs' theory of attrition . . . [Ms.] Lahalih would have attrited in 2007, when she left Chicago."  (City's Proposed Findings [736], at 25 ¶ 142.)  But

---

[49]      The court interprets LOA to mean "leave of absence."

Defendant bears the burden of proving that back pay should be lowered, and it has not presented evidence that Ms. Lahalih would have left Chicago in 2007 had she been a CFD paramedic. When she moved away, she was working two jobs that together paid her less than she would have earned as a CFD paramedic. (Tr. 101:17–20 (Lahalih).) She explains that she also "decided to try to move and get a clear head and try to see what [sic] my career path could take me." (*Id.* at 102:23–25.) If her career path had been established at CFD, it is reasonable to infer that she would not have moved away.

Defendant's remaining arguments are equally unpersuasive. Without supporting law, the City argues that "equity and law preclude Plaintiffs from using the statistical model of the Cohort to their financial benefit . . . , only to deny the same when less favorable circumstances reduce" their back pay. (City's Post-trial Brief [743], at 24.) The court disagrees that the Plaintiffs' calculations are manipulative. Plaintiffs use averages when they lack specific information, such as how much overtime would have been available to Plaintiffs as CFD employees, but they use specific data when that data is available, as it is here. Defendant is correct that a back pay award should not be a windfall for Plaintiffs. *Ford*, 458 U.S. at 234 (explaining that back pay should not "catapult" plaintiffs "into a better position than they would have enjoyed in the absence of discrimination.") However, Defendant has not proven that Plaintiffs would have left CFD paramedic jobs. Back pay will not be reduced by attrition rates.

### C. Interim Earnings

Interim earnings are "earnings from jobs that could not have been worked had no discrimination occurred." *Chesser v. State of Ill.*, 895 F.2d 330, 338 (7th Cir. 1990). Both parties recognize that interim employment reduces Plaintiffs' back pay award. 42 U.S.C.A. § 2000e-5. They disagree, however, about which jobs Plaintiffs could have worked, had they been hired by CFD.

Plaintiffs have provided their W-2's and tax returns. (Exs. J2, P118 (Res); Exs. J7, P147 (Kean); Exs. J21, P136 (Hoard); Ex. J34, J40 (Ernst); Exs. J31, P117 (Lahalih).) They argue that

only earnings from their primary jobs constitute interim earnings, with their primary jobs being those from which they earn their main source of income. Though Ms. Res began earning significant income from her bakery over the last few years, Plaintiffs argue that her primary income continues to be her job with MedEx, where she receives her benefits and health insurance.

Defendant City claims that all of each Plaintiff's earnings constitute interim earnings. The court rejects this position, finding that each woman could have worked her additional jobs in addition to her employment with CFD. CFD paramedics typically work 24-hour shifts with the next 72 hours off. (Tr. 690:4–6 (Vasquez) ("[T]he platoon system for EMS is 24 hours."); Ex. J20, at ERN018994 (describing the shift work in the collective bargaining agreement).). As Deputy Fire Commissioner Anthony Vasquez ("Chief Vasquez") testified regarding CFD paramedics, "a host of people [ ] work side jobs." (Tr. 691:2–3 (Vasquez) (responding to the question, "Do you have paramedics who own businesses and also are employed as paramedics?").) Such a schedule would certainly allow for Plaintiffs to work side jobs without affecting primary employment with the fire department, and the fact that they worked secondary jobs while fully employed elsewhere suggests that they would have done the same if employed with the CFD. (*See* Tr. 243:20–244:17 (Ernst) (explaining that her current employer, LifeLine Ambulance, employs current CFD paramedics, CFD Paramedics in Charge, and one CFD Ambulance Commander—her brother); Tr. 158:7–10 (Kean) ("Q. During your work at MedEx did you have the opportunity to work with CFD paramedics? A. Yes, I did. Many people from the department work part time at MedEx.").)

This is true even for Ms. Res, who works full time at MedEx and concurrently owns and runs M&K Bakery. Ms. Res once referred to her work at the bakery, even when her father still owned and ran it, as a "full time job." (City's Proposed Findings [736], at 6 (citing September 23, 2010 Res Deposition, Exhibit 48 at 320:4–16).) But at that point, she did not have significant income from the bakery. Now, as the owner, she does much of her bookkeeping, payroll, and ordering work from home. (Tr. 456:6–18 (Res).) This would be possible, even if she were employed with CFD as a PIC, given the CFD shift schedule. Further, the fact that income from

her ownership interest in the bakery has exceeded her MedEx income for several years does not disturb the court's determination that Ms. Res' current primary employment is her supervisory position with MedEx.

Therefore, Defendant City's contention that "all earnings are mitigation" is untenable. (Ex. D42, at 6, 9.) The court finds that Plaintiffs' primary positions are those where they work regular, frequent hours and from which they receive benefits. For Ms. Enrst, this is her job at LifeLine, and prior to that, it was her job at MedEx. For Ms. Hoard, this is her job at the University of Chicago, and prior to that, her job at Dixmoor Fire Department. For Ms. Kean, this is her employment with the City of Chicago OEMC, and prior to that, her job at MedEx. For Ms. Lahalih, this means her current job with the Philadelphia Fire Department. Prior to that, her primary employment was, respectively, her jobs at MedEx, Starbucks, and IKEA. Finally, for Ms. Res, this means her job with MedEx. Back pay will only be reduced by Plaintiffs' interim earnings from their primary employment.

### D. Overtime and Supplemental Pay

An award of back pay may include lost overtime compensation. *Kossman v. Calumet Cnty.*, 800 F.2d 697, 703 (7th Cir.1986), *overruled on other grounds by Coston v. Plitt Theatres, Inc.*, 860 F.2d 834, 836 (7th Cir.1988). The court finds that Plaintiffs are entitled to overtime and supplemental back pay, including ALS driver pay[50] and duty availability pay.[51] (Tr. 347:20–348:2

---

[50] ALS Driver Pay appears to be additional pay for paramedics who drive an Advanced Life Support ambulance. *See Fire*, City of Chicago, https://www.cityofchicago.org/city/en/depts/cfd/provdrs/ops.html (last visited Dec. 6, 2018) ("EMS personnel, trained in both basic life support (BLS) and advanced life support (ALS) measures, provide on-scene care, stabilization, and transport of patients."). (Ex. J13 (2003 CBA), at § 16.10, ERN000154 (providing additional pay for ALS ambulance drivers); Tr. 130:9–12 (Lahalih) ("Q. Okay. You also understand that the paramedic in charge pay scale is almost the same as just a paramedic when you consider the driving pay component; isn't that right? A. Yes.").

[51] Duty availability pay is "an additional salary for being on call." (Ex. P116, at 12. *See also* Ex. J13 (2003 CBA), at § 5.7, ERN000091 (providing for quarterly Duty Availability Pay).)

(LoGiudice); Ex. P116, at 6, 11–13.) They should not, however, receive any lost uniform allowance, given that they did not have to buy CFD uniforms.

Overtime and supplemental back pay are to be calculated based on the average overtime and supplemental pay received by members of Plaintiffs' comparator cohort having the same service rank.[52] Plaintiffs should be considered paramedics from April 1, 2005 through August 31, 2008, and PIC's from September 1, 2008, through the date of the court's final damages order. The expert witnesses do not debate the overtime calculation method. (Tr. 646:13–15 (Breshears) (explaining that he used the comparator cohort "to confirm Mr. LoGiudice's computation of the overtime premiums. And in reviewing that, I did not find any issue with that"); Tr. 348:4–16 (LoGiudice) (explaining his overtime calculation).)

### E. Pension Benefits

CFD paramedics receive a pension from the fire department. Though Ms. Kean, Ms. Hoard, and Ms. Lahalih receive pension benefits from their employers, *see* Ex. P116, at 18 *and* Ex. P115, at 6, no Plaintiff's pension benefit has equaled the benefit she would have received as a CFD paramedic. The parties agree that Plaintiffs are entitled to the lost benefit of the CFD pension (City's Proposed Findings [736], at 26 ¶ 147), so the court will only briefly discuss the appropriate method for calculating pension back pay. The more significant disagreement concerns how Plaintiffs should receive that pension, which impacts the total back pay award.

The CFD paramedic pension includes both an employee and an employer contribution. Paramedics contribute 9.125% of their income to their pensions, based on their CFD salary plus the duty availability pay mentioned above. (Ex. P116, at 17; Tr.349:10–340:23 (LoGiudice).) "The City matches the employee contribution by a factor of 2.26." (Ex. P116, at 17.) Employees are

---

[52]     Defendant City points out that Plaintiffs' expert Mr. LoGiudice did not provide the court with the actual number of average overtime hours worked by cohort paramedics. However, he does include overtime in his final calculations, and Mr. Breshears agrees that Mr. LoGiudice's method of calculation is correct. (Tr. 416:4–8 (LoGiudice); Exs. P116.5–116.9; Tr. 646:13–15 (Breshears).)

immediately vested in their own contributions, and beginning with "an employee's tenth year, the employee's interest in the employer match vests at a rate of 10% per year." (Ex. P116, at 17.) Beginning with an employee's twentieth year, she is "entitled to a salary-based pension benefit, in the form of an annuity based on the highest 4 years of salary earned, rather than on contributions made."

After accounting for any Plaintiff's interim employer pension, Mr. LoGiudice calculates that Plaintiffs together were owed pension back pay of $591,364 as of the end of 2017. (Ex. P151.) Mr. Breshears agrees with Mr. LoGiudice's methods. (Tr. 671:8–12 (Breshears) ("Q. . . . And the pension analysis in terms of the rates, contributions, and the like you agree with Mr. LoGiudice that he used the proper formula, just different base numbers upon which to apply to? A. Yes.").) Thus, the court finds Mr. LoGiudice's methods reasonable, and orders the parties to use these methods to calculate lost pension amounts through the date of judgment. In accordance with the findings above, the parties should not reduce pension back pay by any attrition rate, and they should account for appropriate pay increases accompanying the PIC and AC promotions.

The parties disagree on the method of payment of pension back pay. Plaintiffs argue that they should receive the pension back pay as a lump sum; therefore, they include a tax gross-up in their back pay calculation to account for the tax implications of receiving their pension award all at once. (Pls.' Proposed Findings [734], at 58.) *See E.E.O.C. v. N. Star Hosp., Inc.*, 777 F.3d 898, 904 (7th Cir. 2015) (affirming the availability of "an award to compensate a prevailing employee for her increased tax burden as a result of a lump sum award") (quoting *Eshelman v. Agere Sys.*, 554 F.3d 426, 441 (3d Cir. 2009)). The City contends that Plaintiffs should be instated as paramedics now, and that the pension awards may be "structured as a tax deferred award" upon that instatement. (Ex. D42, at 2.) Plaintiffs appear to recognize the tax deferment mechanism available to Plaintiffs in the case of instatement. (*See* Pls.' Proposed Findings [734], at 58 ("The City's damages model . . . [assumes] that the [c]ourt will order reinstatement and that each plaintiff would then become eligible to enroll in the Chicago Fireman's Annuity & Benefit

Fund, creating a tax-deferred vehicle to receive amounts owed for lost pension."). *See also* City's Proposed Findings [7367], at 38 n.6.) The court itself is not certain whether this direct-deposit method is available, nor whether it would, in turn, have any tax consequences.

As discussed below, the court will order Ms. Ernst, Ms. Kean, Ms. Res, and Ms. Hoard to be instated by CFD, but Ms. Lahalih will receive front pay. Because Ms. Lahalih will not be eligible for the tax-deferred option, she should receive a tax gross-up, accounting for both Pennsylvania and Federal taxes, to offset the implications of the award. *See N. Star Hosp.*, 777 F.2d at 441. The parties are ordered to brief the tax implications of depositing the pension back pay award for the remaining Plaintiffs directly into the Fireman's Annuity and Benefit Fund.

### F. Settlement Setoff

In 2014, Plaintiffs received money from a settlement between Plaintiffs and the maker of the PAT test, stemming from a claim filed by Plaintiffs with the Illinois Human Rights Commission against Human Performance Systems, Inc. ("HPS"). (City of Chicago's Contested Issues of Fact and Law [711], at 2.) As Plaintiffs explain, where "Title VII only subjects 'employers' to liability, the Illinois Human Rights Act, by contrast, also allows claims against third-parties, such as test developers, for 'aiding and abetting' an employer's civil rights violations." (Pls.' Response to the City of Chicago's Post-trial Brief and Proposed Findings and Conclusions ("Pls.' Response to the City") [744], at 19 n.12 (citing 775 ILCS 5/6-101(B)).) Defendant City argues that this settlement should be set off against the City's back pay obligations on a pro rata basis. (City's Proposed Findings [736], at 37.)

The City bears the burden of proving that its back pay obligation should be offset by the HPS settlement. *See Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994) (noting the defendant's burden to prove a plaintiff's damages calculation should be reduced); *Hylind v. Xerox Corp.*, 481 F. App'x 819, 824 (4th Cir. 2012) ("The defendant bears the burden of demonstrating that it is entitled to an offset.") (citing *Sloas v. CSX Transp. Inc.*, 616 F.3d 380, 389 (4th Cir. 2010))). The City has offered to provide information regarding the amount of the

settlement *in camera*.  (City's Proposed Findings [736], at 26 n.5).  But the details of the settlement (such the nature of the claims against HPS, or the terms of the settlement) are not in the record, and no pertinent testimony was elicited at trial.  The only testimony that may be construed as evidence of the settlement is Ms. Res's statement regarding her tax 2014 tax returns: "Q.  Was that $[amount redacted by the court] from any sort of work?  A.  No, that's not for a job.  It was a settlement."  (Tr. 460:16–17 (Res) (failing to specify whether she was referring specifically to the HPS settlement).)  Plaintiffs, recognizing the existence of the settlement, argue that the amounts received were for emotional distress and not for back pay damages.  (*See* Pls.' Response to the City of Chicago's Post-trial Brief and Proposed Findings and Conclusions [744], at 20–21 ("The issue is . . . what the payments were for (lost earnings or emotional distress).").)

In support of its argument for the setoff, the City first argues that "federal courts routinely permit setoffs for non-settling defendants in civil rights cases and employment actions."  (City's Post-trial Brief [743], at 27.)  Though that proposition has facial appeal, the case law cited by the City does not support its entitlement to a setoff here.  For example, Defendant City cites *Dobson v. Camden* (*"Dobson I"*), 705 F.2d 759 (5th Cir. 1983) as "adopting a rule of proportional setoff in Section 1983 cases."  (City's Post-trial Brief [743], at 27 n.6.)  The City fails to note that the Fifth Circuit, en banc, modified *Dobson I* to directly contradict the City's position.  *See Dobson v. Camden* (*"Dobson II"*), 725 F.2d 1003 (5th Cir. 1984).  *Dobson* involved Section 1983 and Section 1985 claims against multiple government entities and one private defendant (Denny's).  The private entity settled, while the remaining defendants proceeded to trial.  *Dobson II*, 725 F.2d at 1004.  The Circuit found that the settling party and the remaining defendants were not jointly liable for the injury in question, and that the settlement therefore had no impact on the remaining defendants' liability.  *Id.* at 1005–06.  "Without any basis for joint liability, there are no problems of contribution or of crediting the settlement with Denny's against the recovery from Camden."  *Id.*

at 1006.[53] Here, the City here has similarly failed to present any evidence of overlapping liability between HPS and the City that might reduce the City's liability to the Plaintiffs. (*See* City's Post-trial Brief [743], at 26 ("In October of 2014, Plaintiffs settled the charges against HPS.").)[54]

The City also argues that "a plaintiff is entitled to obtain only one recovery for her injury." (City's Post-trial Brief [743], at 27 (citing *Bosco v. Serhant*, 836 F.2d 271, 280 (7th Cir. 1987)).) The court agrees with this statement of the law, but finds that the City has failed to prove that Plaintiffs have recovered more than once for their lost wages. Because the City fails to prove its right to a setoff for a settlement between Plaintiffs and a third party, Plaintiffs' back pay award will not be reduced.

## G. Prejudgment Interest

"In general, whether and how to award prejudgment interest also lies in the discretion of the district court, although there is a presumption in favor of granting such interest." *Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) (citations omitted). Without pre-judgment interest, "compensation of the plaintiff is incomplete and the defendant has an incentive to delay." *Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) (quoting *Gorenstein Enter., Inc. v. Quality Care–U.S.A., Inc.*, 874 F.2d 431, 436 (7th Cir. 1989)). The parties purport to agree on the prejudgment interest rate (Ex. D42, at 11 n.16 ("The 4.34% interest rate is the same interest rate used by Mr. LoGiudice in his calculations.")), but they may have actually used a different interest rate in their calculations. (Ex. D42, at 11 ("I then applied a 4.34% interest component from the end of each

---

[53]     *Cf. Mason v. City of New York*, 949 F. Supp. 1068, 1078–79 (S.D.N.Y. 1996) (finding that the City of New York's settlement with the plaintiff could offset a judgment against other defendants where, in a Section 1983 suit for false imprisonment stemming, the City and the other defendants bore overlapping, but differently proportioned, responsibility); *Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 789–90 (7th Cir. 2007) (reducing a liquidated damages award by the amount of a prior settlement between the same parties).

[54]     *See also Miller v. Apartments & Homes of New Jersey, Inc.*, 646 F.2d 101, 110 (3d Cir. 1981) ("[T]he non-settling defendant has the burden of proving that the settling defendant was a proper source of contribution, i.e., that the settling defendant would have been liable to the plaintiff for causing the same injury which the non-settling defendant caused.").

year to December 31, 2017"); Ex. P116 ("For payments that should have been received by the Plaintiffs in the past, I accrue interest at a rate of 4.43% to December 31, 2017.").) This may have simply been a typographical error. However, to the extent that the parties disagree on the correct interest rate, the parties are ordered to provide the court with additional briefing.

## PROSPECTIVE RELIEF

### I.     Legal Standard

The Plaintiffs are also entitled to forward-looking relief. *Williams*, 137 F.3d at 951–52; 42 U.S.C. § 2000e-5(g)(1) (providing the district court with power to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees . . . or any other equitable relief as the court deems appropriate"). Plaintiffs have received no job offers from CFD sufficient to cut off the City's back pay or front pay liability; the Plaintiffs have fulfilled their duty to mitigate, and they would be earning higher wages and receiving higher pension contributions today, had they been hired by CFD in 2005.

Instatement (or reinstatement)[55] is "the preferred remedy" for future harm caused by an employer's discriminatory action. *Hutchison*, 42 F.3d at 1045. Instatement may be inappropriate in some circumstances, "such as when 'there [is] no position available or the employer-employee relationship [is] pervaded by hostility.' " *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952 (7th Cir. 1998) (quoting *McNeil v. Economics Lab., Inc.*, 800 F.2d 111, 118 (7th Cir. 1986), *cert. denied*, 481 U.S. 1041 (1987), *overruled on other grounds*, *Coston v. Plitt Theatres, Inc.*, 860 F.2d 834, 836 (7th Cir.1988)). Instatement may also be unsuitable when it "would be difficult for the court to administer." *Hutchison*, 42 F.3d at 1046. *See also Price v. Marshall Erdman & Assocs., Inc.*, 966 F.2d 320, 325 (7th Cir. 1992) ("A federal district court is not equipped to be the labor relations

---

[55]     Though the cases primarily discuss reinstatement, instatement and reinstatement are the same remedy. *See Kraemer v. Franklin & Marshall Coll.*, 941 F. Supp. 479, 481 (E.D. Pa. 1996) (explaining that "reinstatement /instatement ('instatement') is the preferred remedy to avoid future lost earnings"). Defendant City agrees with this characterization. (City's Proposed Findings [736], at 39.)

equivalent of a domestic relations court."). However, instatement should *not* be foregone simply because an employer disfavors the plaintiff's employment on discriminatory grounds, nor because a plaintiff expresses a "disinclination" toward instatement as "a maneuver to get front pay." *Price*, 966 F.2d at 325.[56]

The Seventh Circuit has recognized that the propriety of instatement is not always clear-cut:

> The intermediate case is where the employer dislikes the employee for reasons independent of the latter's membership in a protected class, and where the feasibility of awarding front pay in lieu of reinstatement makes the burden on the court of supervising a coerced employment relation between the parties disproportionate to any gains from giving the plaintiff his preferred remedy.

*Id.* In such circumstances, "a refusal to order reinstatement would be within the trial judge's equitable discretion." *Id. See Hutchison*, 42 F.3d at 1045 ("Reinstatement, although usually the preferred remedy, is not always required. The decision is consigned to the sound discretion of the district court.") (internal citations omitted).

Front pay[57] is generally only awarded "when reinstatement is inappropriate." *Williams*, 137 F.3d at 952. As with instatement, the district court has "very considerable discretion" in awarding front pay. *Downes v. Volkswagen of Am*., Inc., 41 F.3d 1132, 1142 (7th Cir. 1994). "[O]f course, . . . a front pay award must be grounded in available facts, acceptable to a reasonable person and not highly speculative." *Id.* (finding that the district court did not abuse its discretion by awarding three years of front pay instead of the eight requested by the 60-year-old plaintiff, when the plaintiff presented no evidence that he would work the full eight years, and when "restructuring and troubled times at VW made it particularly speculative that [the plaintiff] would

---

[56]     *Price*, 966 F.2d, is an Age Discrimination in Employment Act (ADEA) case, but the case's reasoning with respect to reinstatement and front pay as equitable remedies applies with the same force here.

[57]     "Front pay is [ ] money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co*., 532 U.S. 843, 846 (2001).

have remained more than a few years in any event").  Other facts to consider include "whether the time period for the award is relatively short"[58] and "whether the plaintiff has a reasonable prospect of obtaining comparable employment" in the future.  *Id*. at 1141.

In this case, the Plaintiffs only request front pay, citing a long list of problems with instatement, including their individual life circumstances, the uncertainty created by the nine-month probationary period, and their dissatisfaction with instatement to nonsupervisory roles after years of supervisory experience.  (Pls. Proposed Findings [734], at 32–35.)  The City, in contrast, argues that instatement is the only appropriate remedy.

The court orders that Ms. Lahalih receive front pay through April 2, 2025.  The remaining Plaintiffs should be instated in accordance with the terms laid out below.

## II.      Front Pay Award of Ms. Lahalih

### A.      Front Pay to Cover Period from Date of Judgment through April 2, 2025

Ms. Lahalih should receive front pay through April 2, 2025—the date when she would "have reached 20 years of service and qualified for a salary-based pension benefit" at CFD.  (Pls.' Proposed Findings [734], at 57.)  In 2007, Ms. Lahalih moved to Philadelphia to "try to see [where her] career path could take [her]."  (Tr. 102:18–20 (Lahalih).)  Since then, she has found stable employment with the Philadelphia Fire Department.  Her husband has an established career at a Philadelphia company with no equivalent position in Chicago; they own property and have two small children.  Ms. Lahalih also transferred her paramedic license to Pennsylvania and no longer has a valid Illinois paramedic license.  Under these circumstances, Ms. Lahalih should not be required to uproot her life to take a job that she was wrongfully denied more than a decade ago.  Just as a claimant need not move significant distances in order to fulfill her duty to mitigate damages, Ms. Lahalih will not be so required by the court at the remedial stage.  *Rasimas v.*

---

[58]      "Front pay cannot extend past the time a reasonable person needs to achieve the same or an equivalent position in the absence of discrimination."  *Biondo v. City of Chicago, Ill.*, 382 F.3d 680, 691 (7th Cir. 2004).

*Michigan Dept. of Mental Health*, 714 F.2d 614, 625 (6th Cir. 1983) ("It is well settled that a claimant has not failed to make a reasonable effort to mitigate damages where he refused to accept employment that is an unreasonable distance from his residence.").[59]

The City argues that awarding front pay through April 2025 is unduly speculative. The court disagrees. The City has not proven that Ms. Lahalih would have left CFD for any reason; true, she moved away from Chicago in 2007, but that was motivated by her career search after the City failed to hire her in 2005. In fact, Ms. Lahalih has held incredibly stable employment, which supports her contention that she would have remained at CFD through 2025. She has been working in the same job for ten years, where she intends to work until 2028, "up till [her] pension time." (Tr. 110:14 (Lahalih).) To the extent that it is "speculative" to assume that Ms. Lahalih would have worked through April 2, 2025, the Seventh Circuit has explained that some speculation is necessary any time "lost future earnings have to be estimated." *Price*, 966 F.2d at 326.

The City similarly argues that a front pay period lasting into 2025 is simply too long. As another judge of this court has explained, however, "courts have made front pay awards for lengthy periods of time, through retirement age in certain cases, where the evidence supported it." *Ortega v. Chicago Bd. of Educ.*, 280 F. Supp. 3d 1072, 1111 (N.D. Ill. 2017), *appeal dismissed*, No. 17-3542, 2017 WL 9538121 (7th Cir. Dec. 18, 2017) (citing *Pierce*, 65 F.3d at 574; *Washington v. Office of the State Appellate Def.*, 2016 WL 3058377, at *9–10 (N.D. Ill. May 31, 2016)). *Cf. Biondo*, 382 F.3d at 691 ("[W]e agree with the City that 12 years exceeds the scope of a district court's equitable discretion.").

Finally, the City boldly argues that Ms. Lahalih has "moved on" and that she no longer feels the "sting" of discrimination. (City's Proposed Findings [743], at 10, 30.) The City's failure

---

[59] The City argues that "Plaintiffs presented no evidence that Lahalih would have remained in Chicago if she was employed as a CFD paramedic in 2007." (City's Resp. to Pls.' Proposed Findings [748], at 23.) However, the burden of disproving a plaintiff's established losses falls on the defendant.

to hire Ms. Lahalih has cost her hundreds of thousands of dollars. Being deprived of such an amount certainly is not something that one "moves on" from, even if the claimant has fulfilled her duty to mitigate by finding new employment. No further discussion of this argument is required.

## B. Calculating Front Pay

Plaintiffs' expert, Mr. LoGiudice, calculated front pay for each of the Plaintiffs through April 2, 2025.[60] (Ex. P116, 13–14 (LoGiudice).) The City argues that no front pay award is appropriate and did not offer its own calculations. (Tr. 673:19–21 (Breshears) (explaining that the City did not ask him to calculate front pay).) The court generally finds Mr. LoGiudice's methods reasonable.

Ms. Lahalih's front pay award should be calculated using the most recent CBA pay schedules for PIC's.[61] She should also receive front pay for the duty availability pay she would have earned and the overtime she would have worked. The parties should assume that this pay would increase by two percent each year[62] in order to account for salary increases bargained for by the union. Ms. Lahalih's lost pension benefits should be calculated using the methods Mr. LoGiudice uses in his expert reports.

Accounting for the loss of chance for promotion to the AC position is more complicated. In the back pay discussion above, the court determined that Mr. LoGiudice's methods for calculating back pay for a AC promotion were correct, but that he used the wrong data in his calculation. With respect to AC promotions, specific data regarding Plaintiffs' hiring cohort was

---

[60] The parties' new calculations should be calculated from the date of judgment.

[61] The 2018 CBA had not been signed at the time of Mr. LoGiudice's report. To the extent that a new CBA is available to the parties, its terms should be taken into account.

[62] Mr. LoGiudice analyzed the CBA's in place from 2003 to 2017, as well as corroborating publicly-available statistical data, and determined that, each year, salaries increased on an average of just over two percent. (Tr. 389:7–8, 389:11–360:1; 410:7–11 (LoGiudice); Ex. P116, at 13–14.) This approach is reasonable, and the City proposes no alternative method for compensating for future salary increases.

available.  In the front pay context, however, such data is not available, given that Plaintiffs' cohort is only now reaching a seniority level where a AC promotion is a real possibility.  (Tr. 435:4–5 (LoGiudice) ("If you take a look at it, their chances [of promotion to AC] don't increase to 14 percent until quite recently.").)  Therefore, the parties should calculate the AC promotion probability based on the promotion rates of those 154 employees who took the 2012 and 2016 PIC promotion exams.[63]  (Ex. P116 at 10–11.)  This chance should also be accounted for when calculating the value of Ms. Lahalih's pension.

From the total front pay figure, Ms. Lahalih's mitigating wages[64] and her City of Philadelphia pension contributions[65] must be subtracted.  42 U.S.C. § 2000e-5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.").  It is reasonable to assume that Ms. Lahalih's wages in Philadelphia will increase at the same rate as CFD salaries.[66]  (*See* Tr. 390:19–25 (LoGiudice).)  Finally, because Ms. Lahalih will receive her front pay award as a lump sum, the payment should be reduced by its present value discount—4.43 percent[67]—and it

---

[63]    This data provides the best approximation of the likelihood that Ms. Lahalih would have achieved promotion to the level of AC.   Scores from the 2016 AC examination are now available, *see* Ex. 165, but there is no information in the record concerning promotions stemming from that list.

[64]    As explained in the back pay discussion, only primary employment should be considered mitigating income.

[65]    It is not clear whether Mr. LoGiudice accounted for Ms. Lahalih's City of Philadelphia pension in his front pay calculation.  (*See* Tr. 390:9–393:14 (LoGiudice); *see also* Ex. P116 15–16; Ex. P151 (Rebuttal Report Table 1 Schedule S).)  Her pension should be accounted for in the front pay calculation.  42 U.S.C. § 2000e-5(g)(1).

[66]    With respect to Ms. Lahalih, it is likely that a more accurate wage-increase projection could have been formulated based on the Philadelphia Fire Department's past CBA's.  However, it is Defendant's burden to disprove the Plaintiffs' established losses, and Defendant has provided no such calculation.  Therefore, the court finds it reasonable to presume that Ms. Lahalih's mitigating wages would increase by two percent each year.

[67]    This rate is the same as the prejudgment interest rate used to calculate back pay.  (Ex. P116, at 15.)

should be increased by the amount necessary to neutralize any tax consequence of receiving her front pay and pension in a lump sum.

## III.     Instatement of Ms. Ernst, Ms. Res, Ms. Kean, and Ms. Hoard

### A.     Instatement is Equitable

Plaintiffs Ernst, Res, Kean, and Hoard's also request an award of front pay.   They cite concerns about hostility toward them at CFD if they are instated.  (*See, for example*, Tr. 329:1– 10 (Ernst) ("[B]ecause of the lawsuit and because of the court-ordered instatement, would I have a target on my back?  Would I personally be subject to unfair treatment? . . . Certainly I would have concerns.   Some of the instructors at the academy are certainly people who I [ ] helped train.").)  Though these concerns are valid, some potential for hostility is not sufficient to forego the preferred instatement remedy, and the court concludes that instatement is appropriate for these Plaintiffs.

In *McKelvey v. Sec'y of U.S. Army,* 450 Fed. Appx. 532 (6th Cir. 2011), for example, the Sixth Circuit upheld a district court's decision to reinstate a plaintiff, even though the plaintiff resisted reinstatement to a job where he was harassed for debilitating injuries he suffered while serving in Iraq.   Though the plaintiff argued that "returning to his old workplace would be too traumatic," the court explained that "such feelings likely exist in every discrimination case and are mitigated here by the fact that, were McKelvey to return to the armory, his supervisors and four of his six co-workers would be new, with no connection to the harassment he suffered." *Id.* at 537. *Accord Robles v. Cox & Co.*, 154 F. Supp. 2d 795, 808 (S.D.N.Y. 2001) (finding that Plaintiff's "assertions that defendant still employs friends of the harasser and that returning to work for defendant would cause her mental anguish are insufficient to excuse plaintiff's rejection of an offer of reinstatement").   In this case, unlike *McKelvey* and *Robles*, all hostility or harassment is entirely

speculative.[68]   The court will retain jurisdiction over the case, further assuaging Plaintiffs' fears about unfair treatment.

Instatement gives Ms. Ernst, Res, Kean, and Hoard every opportunity that they were denied in the past—they will receive full pay and seniority as described below; they will have the opportunity to compete for promotions; and they will receive retirement benefits.  Today, they all continue to work in fields related to medical care, and, though they are now thirteen years older than they were when they first applied to CFD, no party has presented evidence that any Plaintiff is physically incapable of being a paramedic.[69]

Plaintiffs note individual circumstances that make instatement less preferable for them.  Ms. Ernst, for example, explains that her partner wishes to move out of the City of Chicago. While this may make the decision to accept instatement more difficult, it does not render instatement inequitable.  Ms. Res notes the age and ill health of her parents, who she helps care for.  This concern goes primarily to the time demands of the nine-week training academy.  The court does not find it inequitable to require Ms. Res to find additional help for the nine weeks.  In fact, once the academy is over, the one-day-on, three-days-off CFD paramedic schedule should be beneficial to Ms. Res.   Finally, the same reasoning applies to Ms. Kean's unfortunate circumstances with her daughter, who requires Ms. Kean's time and care.  Though these circumstances certainly make it more difficult for Plaintiffs to decide whether to accept

---

[68]        Some courts do take Plaintiffs' preferences against instatement into account, but those facts are typically more egregious than in this case.  In *Ortega*, 280 F. Supp., for example, a Chicago teacher was terminated in violation of the Americans with Disabilities Act.  After her termination, the Chicago Board of Education continued taking action against her and offered to reinstate her, but only if she agreed to a 'dock' in salary."  *Id.* at 1107.  The court credited Ms. Ortega's "sincere . . . feelings of distrust, lack of confidence, and trauma from her experiences with the Board," which were "exacerbated by the [940] rejections she received of her [Chicago Public Schools] job applications."  *Id.* at 1108.  In that context, the district judge gave Plaintiff's "preference against reinstatement" significant weight.  *Ortega*, 280 F. Supp. 3d at 1107 (citing *Price*, 966 F.2d at 325).  In this case, Plaintiffs have only been rejected from the fire department a handful of times, while the facts in *Ortega* generating distrust were more extreme.

[69]        Though Ms. Kean had knee surgery several years ago, her knees have healed. (Tr. 176:2 (Kean).)

instatement, they are not so extreme as to render instatement inequitable. Thus, Ms. Ernst, Ms. Res, Ms. Kean, and Ms. Hoard should be instated as follows.

**B.    Directions for Instatement**

Plaintiffs should be instated by CFD as entry-level paramedics. At all times from the date of judgment until they have their first promotion opportunity, Plaintiffs are to receive pay and benefits as PIC's, adjusted for seniority, and including an adjustment for the loss of a chance at becoming an AC. Recognizing the City's legitimate public safety concerns, Plaintiffs are ordered to complete the paramedic training academy under the following conditions: Plaintiffs will continue receiving their full salaries, leading up to and through the academy, and will be full employees, not probationary employees. This should ameliorate their concerns about any new discrimination against them.

During her academy training, Ms. Res may continue to oversee her bakery, so long as that work does not detract in any way from her participation in the academy.[70] And, the Plaintiffs are to have at least two opportunities to pass the academy, so long as they put forth a good faith effort. In the event that a Plaintiff fails the academy, she is to continue receiving her full pay and benefits. The parties should request a hearing with this court if a Plaintiff fail the academy more than twice. It is reasonable, on public safety grounds, to require the Plaintiffs to pass background checks, drug tests, and medical screenings before entering the academy, but they need not pass the Avesta test, as the parties have stipulated to Plaintiffs' hire.

Once Plaintiffs have completed the academy training and received their assignments, they are to apply for the PIC promotion as soon as they are eligible. *See Biondo*, 382 F.3d at 691 ("The opportunity to seek promotion then gives each plaintiff everything to which he is entitled; a

---

[70]    Ms. Res may maintain her secondary employment at her bakery, as she is the owner of the business, and her obligations to that business are ongoing. Her absence could have repercussions for her business's future, and permitting this employment conforms with her rights as a full CFD employee. However, Ms. Hoard, Ms. Kean, and Ms. Ernst should refrain from any secondary employment during the academy; their secondary employment appears to have always been sporadic and none are self-employed.

lieutenant or captain who does not achieve a competitive promotion no longer can blame his status on discrimination that delayed (but did not prevent) promotion . . . Setting this limit also gives plaintiffs an incentive to compete for promotions.").  The salary of any Plaintiff who fails to do so will revert back to the F1 paramedic pay scale (while retaining seniority).  Similarly, Plaintiffs must apply for the first AC promotional opportunity for which they are eligible.

## CONCLUSION

Plaintiffs Ernst, Hoard, Res, and Kean are entitled to instatement as paramedics and an award of back pay.  Plaintiff Lahalih is entitled to back pay and front pay to April 2025.  The parties are directed to prepare calculations as directed in this opinion and to submit a proposed judgment order, agreed as to form, within 21 days.

ENTER:

_____
REBECCA R. PALLMEYER
United States District Judge

Date:   December 21, 2018